OHANNES CHOBANIAN *vs.* WASHBURN WIRE COMPANY.

JULY 14, 1911.

PRESENT: Dubois, C. J., Blodgett, Johnson, and Parkhurst, JJ.

*(1) Negligence. Master and Servant. Unsafe Methods.*

Plaintiff was in employ of defendant as a "yardman" and had been in its employ about a year when he was injured. He was working in a pit, in the steel plant and was inexperienced in that kind of work.

In the bottom of the pit resting upon the dirt were round iron plates upon which cast-iron ingot molds were set when lowered into the pit for the pouring. The mold tapered from top to bottom, and when in the pit rested upon its smaller end. It had two trunnions on opposite sides. When the steel was ready for a pouring, the bottom or smaller end of the mold was closed by inserting a clay brick in it and wedging it in if too small with wooden wedges. A travelling crane was 35 feet above the pit from which two hooks were suspended. The crane operator was in the crane basket connected with the travelling part of the crane. These hooks which were made in the blacksmith shop of defendant, grasped the mold by the trunnions and swung it into the air and over into the pit. The pit gang consisted

of five men, a sub-foreman and four men.   Two men of this gang having left, plaintiff and another workman who had been employed as yardmen were sent in to take their places.   The work of the pit gang was to set molds, put in bottoms, clean the pit, etc., and each man took his turn.   Plaintiff was in the pit setting ingot molds.   His work was to stand in the bottom and guide the mold as it was lowered by the crane man so that it would properly rest on the plate.   He had set five and was setting the sixth which had been lowered by the crane man.   When it rested on the plate the trunnions were not in line with those upon the mold next to it.   Plaintiff signalled the crane man to raise it a little to align it and when he again lowered it, the brick was out of the bottom of the mold on the plate; the mold struck the brick, the hooks came off the trunnions, the mold fell on plaintiff, crushing and burning him.

There was testimony that the brick bottoms had fallen out on the average of once a week for a year, but no testimony showed any knowledge of this by plaintiff and he stated that he had not been warned.   There was conflicting testimony as to the dangerous character of the hook used by defendant, and as to the method of inserting the wedges.

*Held,* that a verdict for plaintiff was supported by the evidence.

*(2)   Pleading.   Stating Employment of Plaintiff.*

An averment in a declaration that plaintiff was in employment of defendant as a common laborer, and at request of defendant was engaged at work in a certain foundry room, near a certain mold attached to a crane, alleges the employment of plaintiff with all the particularity required.

*(3)   Pleading.   Negligence.*

An averment in a declaration that a mold near which he was working fell upon plaintiff and that the fall was caused by some defect in the mold or its supports or connections of which defendant knew, but of which plaintiff had no knowledge and therefore could not state, is a sufficient averment of negligence.

*(4)   Pleading.   Negligence.*

Where a declaration does not show that the danger was obvious to the plaintiff and it expressly avers that he was inexperienced and ignorant of the danger, the court cannot say as a matter of law, that the danger was obvious.

*(5)   Pleading.   Surplusage.*

In an action for negligence against a master, an allegation that plaintiff was a foreigner will be treated as surplusage.

*(6)   Master and Servant.   Negligence.   Obvious Risk.   Demurrers.*

A demurrer to a declaration on the ground that the alleged danger was obvious was properly overruled where the declaration averred that plaintiff was inexperienced and did not appreciate the risks and dangers of the facts alleged as negligence, and that the place in which he was working was close and narrow and in close proximity to a wall, so that it would be impossible for him to escape.

*(7)  Amendments to Declaration.  New Cause of Action.  Statute of Limitations.*

The allowance of an amendment to a declaration setting forth an additional ground of negligence as the cause of the same injury does not amount to the statement of a new cause of action.

Where additional counts do not introduce a different cause of action, they are properly allowed, although the period of limitations has expired, for the amended pleading is regarded as a continuation of the original pleading and takes effect as of the date when the latter was filed.

*(8)  Master and Servant.  Evidence.*

Where witness had stated that he could not see the bottom of the mold at the time it fell on him because it was dark, and too high for him to go around and see, a question as to how the place was lighted was properly admitted.

*(9)  Evidence.  Safe Methods.*

While not conclusive on the question of negligence evidence is generally admissible in an action for personal injuries to show whether or not the master's machinery, appliances, ways and methods are such as are in ordinary and common use by others in the same business.

*(10)  Expert Evidence.  Safe Methods.*

An expert witness was properly permitted to testify as to whether in his judgment one form of hook was as safe for use as another form.

*(11)  Request to Charge.  Issue of Fact.*

A request to charge embodying an issue of fact which it is the province of the jury to decide is properly denied.

*(12)  Request to Charge.  Direction of Verdict.*

A request to charge which in effect is a request for a direction of a verdict, is properly denied.

*(13)  Damages.*

A verdict for $11,916.00 for an injury to a man, thirty years of age who was earning $14 a week, is not excessive where he suffered amputation of his right arm, with great pain at the time of the accident and long after it, and has been unable to work since such accident and it appeared by medical testimony that he had suffered a severe and probably permanent shock to his nervous system, and would probably continue to suffer pain for the rest of his life.

BLODGETT, J., dissents.

TRESPASS ON THE CASE for negligence.  Heard on exceptions of defendant and overruled.

JOHNSON, J.  This is an action brought to recover damages, as appears in the writ dated August 2, A. D. 1906, and returnable to the Superior Court, Providence county,

September 11, A. D. 1906, for personal injuries sustained by the plaintiff while in the employ of defendant on the twentieth day of April, A. D. 1905, through the negligence of said defendant.

(1)    The plaintiff, Ohannes Chobanian, was injured about 2 a. m., on the twentieth day of April, A. D. 1905, at the plant of the defendant in Phillipsdale, R. I., where he was employed. He was about thirty years of age at the time, and had been in this country about three years. Plaintiff entered the employ of defendant a few months after he came to this country, as a yardman, and, after working for said defendant about seven or eight months, left to take a position elsewhere. After being away about a year, he returned to work for the defendant and was in its employ about a year when he received the injuries herein referred to.

At the time he was injured he was working in a pit, in what is called the open hearth room, in defendant's steel plant, and was inexperienced in that kind of work. This is a long, large rectangular-shaped building with earthen floors, and contains two earthen pits in which cast-iron ingot molds are set to receive pourings of steel from the furnaces which are located just south of and above the pits. These two pits are known as pit number 1 and pit number 2. The plaintiff was injured while at work in pit number 2.

In the bottom of the pit, resting upon the dirt, were round iron plates, upon which the molds were set when lowered into the pit for the pouring. There were four plates in a row, extending widthwise of the pit. The molds used were about five feet in height and weighed about nineteen hundred and fifty pounds each.

The mold in its construction tapered from top to bottom, the top being larger than the bottom. When set on the plate in the pit, it rested upon its smaller end, the upper end coming slightly above the top of the pit. Each mold had two trunnions on opposite sides located about one-third the way down from the top. When the steel was ready for a

pouring the bottom or smaller end of the mold was closed by inserting a sort of square-shaped clay brick into it and wedging it in, if too small, with wooden wedges, which were put in between the mold and the brick.

About thirty-five feet above the pit was located a travelling crane, from which, by means of chains or falls, two hooks were suspended. The crane operator, whose name was August Johnson, was located in the crane basket which was connected with the travelling part of the crane. These hooks, which were made by the defendant in its blacksmith shop, were open hooks and grasped the mold by the trunnions and swung it into the air and over into the pit where it was to be set.

The pit gang consisted of five men. The names of these men were Charles J. Johnson, the sub-foreman, Victor Benson, Gustave Anderson, Harry Leary and Ohannes Chobanian. This was the usual number that comprised the pit gang and each man received the same amount of pay. Two men who had worked in the pit gang had left shortly before Chobanian was injured, and Leary and Chobanian, who theretofore had been working outside as yardmen, were sent in to take their places in order to bring the pit gang up to the regular number of five. The work of these men was to set molds, put bottoms in molds, clean the pit, and work of that character, and each man took his turn.

Plaintiff was in the pit setting ingot molds preparatory to the pouring when injured. The work of the person setting was to stand in the bottom of the pit and guide mold as it was lowered into the pit by the crane man, so that it would rest properly in its place upon the iron plate in the bottom of the pit.

The molds that were being lowered into the pit to the plaintiff had passed through a heating that night and plaintiff used bagging to protect his hands when placing the molds in position. He had set five molds and was setting the sixth one, which would be the second mold in the second row,

when he was injured. The crane man had lowered this sixth mold and when it rested upon the plate the trunnions upon that mold were not in line with the trunnions upon the mold next to it.

The plaintiff signalled the crane man to raise the mold a little so as to align it. The crane man then raised the mold and when he lowered it the second time the brick was out of the bottom of the mold upon the plate, the mold struck upon the brick, the hooks came off the trunnions and the mold toppled over upon the plaintiff, who was between the mold and the side of the pit, and the upper end of the mold fell upon plaintiff's right arm and pinioned it against the side of the pit. The weight of the mold crushed the arm, and the heat of the mold burned the arm to the bone before the mold could be removed. As the hooks had come off the trunnions when the mold fell over, the crane man was powerless to handle the mold or to move it from off the plaintiff's arm until two of the other pit men jumped into the pit and affixed the hooks to the trunnions, and the mold was then removed from the plaintiff's arm. The plaintiff was taken to the Rhode Island Hospital, where his arm was amputated that day.

The case was tried before Mr. Justice Rathbun and a jury in the Superior Court, on the 29th day of April and the 2d, 3d and 4th days of May, 1910. The jury returned a verdict for the plaintiff for $11,916.

On the 9th day of May, 1910, the defendant filed its motion for a new trial, on the following grounds: 1. That said verdict was against the evidence and the weight thereof. 2. That the damages assessed were excessive. Said motion for a new trial was heard by the said justice on the 25th day of June, 1910, and was argued by counsel for plaintiff and defendant and on the 17th day of September, 1910, was denied. Thereupon the defendant filed its bill of exceptions, which sets forth exceptions to the rulings of the Superior Court in the following particulars: 1. Overruling the demurrers of defendant to plaintiff's amended declaration.

2.   Denying the motion of defendant to strike out the additional counts to plaintiff's declaration. 3. Admissions of testimony. 4. Refusals to rule and charge, as requested by defendant. 5. Decision denying defendant's motion for new trial.

The amended declaration is in eight counts, which may be stated as follows:

The first count alleges that the plaintiff was in the employ of the defendant as a common laborer, in a certain room, to wit, a factory of the defendant at East Providence, and in the course of said employment and at the request of the defendant was working near a certain steel mold, which was attached to an overhead truck by means of wire cables, and which was lowered by said defendant and placed in an upright position on the floor of said room, and while the plaintiff was so engaged and exercising reasonable care, and without any fault of the plaintiff, the said mold fell from its upright position on the floor of said room near where the plaintiff was working, as aforesaid, the cause of which fall was to the plaintiff unknown, which fall the plaintiff had no cause or reason to anticipate, or prevent; but which fall was caused by some defect in said mold or in the supports to or connections with the same, of which the defendant knew or but for the want of reasonable care and diligence would have known, which defect was caused by the negligence of the defendant, and by reason of said fall said mold was violently forced and thrown upon the plaintiff and by means thereof he was injured.

The second count is practically the same as the first.

The third count alleges an insecure brick base in connection with the mold, which became loose and fell out of the mold causing the mold to fall.

The fourth count alleges an insecure brick bottom placed in the mold by means of certain wedges, so that the bottom became liable to fall out when the mold was being lowered and cause the mold to fall over.

The fifth count alleges negligence in fastening the crane

to the mold by hooks, whereby the crane was enabled to become prematurely unfastened from the mold, permitting the mold to fall over while being lowered.

The sixth count alleges negligence in using hooks in connection with the crane.

The seventh count alleges failure to warn plaintiff, who was inexperienced, of the dangers and risks of his employment in connection with the molds, setting forth said dangers and the knowledge of the defendant and the ignorance of the plaintiff relative thereto.

The eighth count alleges the failure to provide plaintiff with a safe place in which to perform his work, setting forth the ignorance of the plaintiff and the knowledge of the defendant as to the same.

The defendant's demurrers, heard by presiding Justice Sweetland, were argued by counsel and were overruled as to all counts except the sixth count.

The rescript is as follows:

"SWEETLAND, P. J. The declaration sufficiently alleges the work the plaintiff was engaged in at the time of receiving the alleged injury. The different counts of the declaration, excepting the sixth, sufficiently allege negligence in the defendant and set out the defendant's negligence with as much particularity as should be required of the plaintiff in the circumstances alleged. The Court cannot say as a matter of law from the allegations of the fifth, sixth, seventh and eighth counts of the declaration that the dangers therein alleged were obvious to the plaintiff.

"The allegation in the seventh and eighth counts that the plaintiff was a foreigner, to wit: an Armenian, may be treated as surplusage and does not render the counts demurrable.

"The fourth ground of demurrer to the sixth count of the declaration does set out a valid objection to said count as it does not appear by the allegations of said count wherein hooks were improperly, carelessly or negligently used in

connection with and as a part of the crane or appliance in said count mentioned.

"Demurrer to first, second, third, fourth, fifth, seventh and eighth counts of the declaration overruled.

"Demurrer to sixth count of the declaration sustained on the fourth ground of demurrer."

(2) · The first ground of demurrer to each of the counts sets forth the objection to be that it does not appear by said count in what particular work the plaintiff was engaged at the time he was injured. It. is distinctly averred in all of said counts that the plaintiff was in the service and employment of the defendant as a common laborer, and at the request of the defendant was engaged at work at the time he was injured in a certain foundry room, owned and operated by the defendant at East Providence, and in the course of his employment and at the request of said defendant was working near a certain mold which was attached to an overhead crane.

The employment of the defendant is therefore alleged with all the particularity required under the rules of pleading, and the defendant can take nothing by this objection. *Ellis* v. *Waldron*, 19 R. I. 369, at 372.

(3) The second ground of objection to the first count is that it does not appear by said count that the defendant was guilty of negligence. The declaration alleges that a mold near which the plaintiff was working fell upon him and that the fall was caused by some defect in the mold or in its supports or connections, of which the defendant knew, but of which the plaintiff had no knowledge, and therefore could not particularize. The case of *Cox* v. *Providence Gas Co.*, ·17 R. I. 199, supports this count; see, also, *Ellis* v. *Waldron*, ·19 R. I. 369.

The third ground of objection to the first count is that it does not appear wherein the defendant was negligent. On the contrary, it is distinctly averred in said count that this ·defective condition of the mold or its supports and connections was known to the defendant, or might have become

known to it but for want of reasonable care, and the defect was caused and occasioned by the negligence of the defendant.

The second and third grounds of objection to the second count are practically the same objections as the two last referred to.

As to the defendant's second ground of objection to the third count, a reference to said count shows that the negligence upon which said count is based is particularly and specifically set forth.

As to the defendant's second ground of objection to the fourth count, said count distinctly alleges that the defendant negligently joined a brick bottom in the mold so that it was liable to become unfastened from the mold and by reason thereof, while the mold was being lowered, to cause the mold to fall.

The second ground of defendant's demurrer to plaintiff's fifth count is that it does not appear in said count that the defendant was guilty of any negligence. This count, after describing the place where plaintiff was employed and the appliances that were used in connection with the molds, avers that the defendant carelessly and negligently permitted the mold, in connection with which the plaintiff was working, to be dangerous and perilous to his safety, in that the crane used in connection with said mold was improperly joined to the mold by hooks which were liable to become prematurely unfastened from the mold and permit the mold to fall over on the plaintiff.

As to the defendant's third ground of demurrer to the fifth count, wherein defendant alleges that it does not appear in and by said count wherein defendant was negligent, it is set forth in said fifth count that the same consisted in negligently joining the crane to the mold by hooks, whereby the mold was enabled to become prematurely unfastened from the crane, thus withdrawing the supports from the mold and permitting said mold, when being lowered, to fall over, and while so falling, to strike and fall upon persons working about said apparatus.

The fourth ground of demurrer to said fifth count is practically the same as the said third ground.

As to the defendant's fifth ground of demurrer to said fifth count, in which the defendant claims that the alleged danger was obvious to plaintiff, it is averred in said count that the plaintiff was not aware of the aforesaid dangerous condition of the mold or the perils and dangers to which he was thereby exposed.

The defendant's demurrer to the sixth count was sustained.

(4)   As to the second ground of demurrer to the plaintiff's seventh count, said count does not show that the danger was obvious to the plaintiff, and it is expressly averred therein that the plaintiff was inexperienced and ignorant of the danger referred to therein.   The court could not say, therefore, that as a matter of law, the dangers therein alleged were obvious to plaintiff.

(5)   The allegation in the said seventh count as to the plaintiff being a foreigner, which forms the basis of the defendant's third ground of demurrer to said count, was properly treated by the Superior Court as surplusage.

As to the fourth ground of demurrer to said seventh count, it is expressly averred in said count that the plaintiff was required to work about and near a mold which fell upon him while it was being lowered.

(6)   As to the second ground of demurrer to the eighth count, in which the defendant claims that the alleged danger was obvious, a reference to said count shows that it is averred that the plaintiff was inexperienced and did not appreciate the risks and dangers of the hooks coming off the mold or the bricks dropping out of the mold or the mold falling while being lowered, and that the place in which plaintiff was working was close and narrow and in close proximity to a wall, so that it would be impossible for him to escape being struck by a mold in case it should fall over while being lowered.

The third ground of demurrer to said eighth count is the

same as the third ground of demurrer to the seventh count.

The fourth and fifth grounds of demurrer to said eighth count are covered by our considerations of the second ground of demurrer to this count.

A reference to the various counts of the declaration shows that they set forth the negligence upon which they are based with all the particularity that should be required of the plaintiff in the circumstances alleged.

The Superior Court did not err in overruling defendant's demurrers to the first, second, third, fourth, fifth, seventh, and eighth counts of the declaration.

(7)    The defendant's second exception is to the decision of the Superior Court denying the defendant's motion to strike out three certain counts of the plaintiff's declaration, designated as "First Additional Count," "Second Additional Count," and "Third Additional Count," respectively. Said counts were filed on March 20th, 1909, to an amended declaration then on file in said case, said filing being more than two years after the accident. In said three additional counts the plaintiff set forth the following additional specifications of negligence, viz.: that improper hooks were used in connection with the trunnions and specifying in what particulars the hooks were improper; the employment of incompetent fellow servants, and the defendant's failure to properly inspect.

The defendant's motion to strike out said additional counts was based upon two grounds, first, that in each of said additional counts the plaintiff stated a cause of action different from the causes of action stated in the amended declaration, and, second, that said additional counts were not filed within two years after the causes of action in said additional counts had accrued.

The rule is stated in 1 Ency. Pl. & Pr. 564, as follows: "As long as the plaintiff adheres to the contract or the injury originally declared upon, an alteration of the modes in which the defendant has broken the contract or caused the injury is not an introduction of a new cause of action. The test is

whether the proposed amendment is a different matter, another subject of controversy, or the same matter more fully or differently laid to meet the possible scope and varying phases of the testimony."

In *Columbus* v. *Anglin*, 120 Ga. 785, the question was whether an amendment to the declaration was properly allowed under a statute providing that "no amendment adding a new and distinct cause of action, or new and distinct parties, shall be allowed unless expressly provided for by law." The plaintiff sued for damages for personal injuries resulting from the fall of a shed built over a sidewalk. The negligence alleged in the original declaration was that the municipal authorities had changed the grade of a certain street and put insufficient drains therein, so that the surface water was allowed to pond near and upon the sidewalk and cause a washout, which the municipal authorities negligently filled with unsuitable material, thereby causing the support of the shed to settle, and as a result the wooden shed fell upon the plaintiff. The trial court allowed an amendment setting forth a further ground of negligence, in this, that the defendant had failed in its duty to inspect said shed and permitted said street to be dangerous by allowing said shed to stand and that from said neglect of duty said shed fell and injured the plaintiff. The court held that the amendment was properly allowed and that no new and distinct cause of action is added by an amendment containing additional matter descriptive of the same wrong originally pleaded. The rule is laid down that when in an action *ex delicto*, the declaration sets out certain acts of negligence, to show a violation by defendant of the plaintiff's right, such petition may be amended by setting out additional acts of negligence to show substantially the same violation of the same right. The reasoning of the court is shown in the following excerpts from the opinion: "So long as a plaintiff pleads but one wrong, he does not set up more than one cause of action. Courts will look to the allegations both as to the primary right of the plaintiff and the

corresponding primary duty of the defendant, and as to the violation or breach thereof, in order to determine whether it is the intention to plead but a single wrong only, or more than one.    A single wrong may, however, be composed of numerous elements and shown by various facts.    Facts, alone or in conjunction with purely substantive law, do not give a right of action, but are alleged in order to show a wrong which has called into operation the remedial law which gives the right of action.    The facts are merely the means, and not the end.    They do not constitute the cause of action, but they show its existence by making the wrong appear. ' The *thing*, therefore, which in contemplation of law as its *cause*, becomes a ground for action, is not the group of *facts* alleged in the declaration, bill, or indictment, *but the result of these in a legal wrong, the existence of which, if true, they conclusively evince.*'    Sibley, Right to and Cause for Action, 48. Different facts may be alleged, separately or cumulatively, to show the same wrong, and the manner and variety of the facts alleged will not make more than one cause of action, so long as but one wrong is shown.    A single wrong will not be made plural by alleging that it is made up of a number of constituent parts."    . . .    "If there is a substantial identity of wrong (which necessarily includes identity of the right violated), there is substantial identity of cause of action.

In *Smith* v. *Bogenschutz*, 19 S. W. (Ky.) 667, the plaintiff, a laborer in defendant's foundry sued to recover damages for personal injuries caused by an overflow of molten iron from a ladle in which it was being carried.    The negligence alleged in the original petition was the failure of the defendant to widen a narrow and dangerous passageway so as to render it safe for the employees in carrying molten iron in ladles from one part of the building to another.    The court held that an amendment alleging that the overflow was due to a defect in the ladle was not an introduction of a new cause of action.    The court said, "The injury to the plaintiff was caused by the spilling or the boiling over of this molten

iron in the ladle in which it was being carried; and the allegation that the overflow of the liquid was caused by the narrowness of the passageway bringing the workmen too close together in carrying it, if untrue, was not the real cause of the injury, and did not estop the plaintiff from alleging that this overflow was produced from a different cause; nor did it change the character of the action. It is at least the same cause of action, viz., the injury to the plaintiff by the overflow of this liquid. If the plaintiff had been injured by a defect in a particular part of the machinery connected with this foundry—a fact known to the defendant— the averment as to the cause of the defect or the character of the negligence would not preclude the plaintiff from alleging that the defect in the machinery was to be attributed to another cause than that alleged, or that the negligence of the defendant, with reference to the particular machinery, was different from that alleged; it is but one cause of action."

In *Wilson* v. *N. Y., N. H. & H. R. R. Co.*, 18 R. I., 598, one of the grounds of the defendant's petition for a new trial was the allowance by the trial court of the filing by the plaintiff of an amended declaration, against the defendant's objection. In behalf of the defendant it was contended that the amendment was improper in that it was in a matter of substance rather than of form, and that it amounted to the statement of a new cause of action. An examination of the papers of the case shows that the original declaration was in two counts, the first count alleging that the defendant was negligent in that it carelessly, negligently and improperly propelled, drove, managed and conducted the said engine, etc., so that the same was driven upon and against the plaintiff, and the second count set up as a ground of negligence the act of the defendant in leaving the gates open at a certain railway crossing and in inviting the driver of the sleigh in which the plaintiff was riding to cross the track and negligence in running and controlling its cars. The additional count which was filed as an amendment set forth a distinct ground of negligence in that the defendant

failed to place a flagman at the grade crossing as required by law and the order of the town council of Cumberland. The court said, "The amended declaration sets forth with more particularity than in the original declaration the matters in which it is alleged the defendant was guilty of negligence, but does not change the form of action or introduce a new cause of action." *Atlantic Mills* v. *Superior Court*, 32 R. I. 285.

The great weight of authority is to the effect that the allowance of an amendment to a declaration setting forth an additional ground of negligence as the cause of the same injury does not amount to the statement of a new cause of action. *Smith* v. *Missouri, Pac. Ry. Co.*, 56 Fed. 458; *Cross* v. *Evans*, 86 Fed. 1; *Columb* v. *Webster Mfg. Co.* 84 Fed. 592; *Berube* v. *Horton*, 199 Mass. 421; *Daley* v. *Gates*, 65 Vt. 591; *McIntire* v. *The Eastern Railroad*, 58 N. H. 137; *Babb* v. *Paper Co.*, 99 Me. 298; *Kuhns* v. *Ry. Co.*, 76 Iowa, 67; *Sheffield* v. *Harris*, 112 Ala. 614; *Greer* v. *Railroad Co.*, 94 Ky. 169; *Pickett* v. *Railway*, 74 S. C. 236; *Lee* v. *Republic Steel Co.*, 241 Ill. 372; *Tanner* v. *Harper*, 32 Col. 156; *Straus* v. *Buchman*, 96 App. Div. (N. Y.) 270; *Davis* v. *R. R. Co.*, 110 N. Y. 646; *Galveston, &c., R. R. Co.* v. *Perry*, 85 S. W. (Tex.) 62; *District of Columbia* v. *Frazer*, 21 App. D. C. 154; *Texas, etc., Ry. Co.* v. *Cox*, 145 U. S. 593.

The cases cited by defendant's counsel are not in our opinion in conflict with the cases cited *supra*. The amendments which it was held could not be granted, in every case set out causes of action which were clearly separate and distinct from those set out in the declaration to which they were offered.

In *Wright* v. *Hart's Admr.*, 44 Pa. St., 454, the court said: "This claim was three years old when the suit was brought, nine years old when the declaration was filed, and twenty-one years old when the amendment was allowed on which the recovery was had. It could not therefore be introduced by amendment, unless it plainly appears that the amendment is a mere specification of a claim already sub-

stantially counted upon." The note declared on was dated October 10, 1837, and was for $541.34, payable to Lewis Darragh and endorsed to the plaintiff. The note set out in the amendment was made by Lewis Darragh, dated October 16, 1837, and was for $525.

In *Allen* v. *Tuscarora Valley R. Co.*, 229 Pa. St., 97, the declaration was at common law for injury resulting from the negligence of defendant in using a coupler more dangerous than the usual coupler employed on railroads. The amendment alleged that the railroad was engaged in interstate commerce and its cars were equipped with couplers in violation of the act of Congress of March 2, 1893. Such a change was held to be a departure in law.

In *Quimby* v. *Claflin*, 27 Hun. (N. Y.) 611, plaintiff had leave below to amend by adding as a third cause of action, a further claim against the defendant for $34,000, which said claim was barred by the statute of limitations. The court held that the amendment was improperly allowed.

In *Pratt* v. *Cir. Judge*, 105 Mich. 499, the amendments offered stated that the plaintiff was in the exercise of due care and did not in any way contribute to the injury. The court say: "The declaration, as amended, relates to precisely the same state of facts, and no new theory is evolved by the proposed amendments which simply amplify the averments contained in the original declaration by statements in no way inconsistent with those originally set out. It is a question of acknowledged difficulty to ascertain in just what cases an amendment may be said to set out a new cause of action, but we think the result of the authorities is well summarized in 1 Enc. Pl. & Pr. 564, as follows:" (quoted by us supra) "And, when the amendment does not introduce a new cause of action, the running of the statute of limitations is arrested at the date of the institution of the suit. See 1 Enc. Pl. & Pr. 621."

In *Buel* v. *Transfer Co.*, 45 Mo. 562, the court say: "Whether an amendment by relation takes effect from the commencement of the suit, or only from the term of its

filing, depends on circumstances.   The rule is this:   When the amendments set up no new matter or claim, but is a mere variation of the allegations affecting a demand already in issue, then the amendment relates to the commencement of the suit, and the running of the statute is arrested at that point; but when the amendment introduces a new claim, not before asserted, then it is not treated as relating to the commencement of the suit, but as equivalent to a fresh suit upon a new cause of action—the running of the statute continuing down to the time the amendment is filed."

Inasmuch as the three additional counts did not introduce any new or different cause of action, the Superior Court did not err in overruling the defendant's motion to strike out said counts, even though the period of limitations had expired.   *Atlantic Mills* v. *Superior Court*, 32 R. I. 285. The rule is stated in Ency. Pl. & Pr. Vol. 1, p. 621, "Where an amendment has been properly made and is for the same cause of action, the amended pleading is regarded as a continuation of the original pleading and takes effect as of the date when the latter was filed."   *Clark* v. *Delaware, etc., Canal Co.*, 11 R. I. 36.   "Where an amendment does not set up a new cause of action, or bring in any new parties, the running of the statute of limitations is arrested at the date of filing the original pleading."   Ency. Pl. & Pr. Vol. 1, p. 621; *Berube* v. *Horton*, 199 Mass. 421; *Lee* v. *Republic Steel Co.*, 241 Ill. 372; *Sheffield* v. *Harris*, 112 Ala. 614; *Quimby* v. *Claflin*, 27 Hun. (N. Y.) 611; *Buel* v. *Transfer Co.*, 45 Mo. 562.

Of the exceptions to the admission of testimony:

(8)     The first, as shown on page 34 of the transcript of the evidence, was taken to the admission of a question asked of plaintiff as to how the place was lighted.   The plaintiff was injured about two o'clock in the morning while in a pit. Just prior to asking the question objected to, the witness was asked whether he could see the bottom of the mold at the time it tipped over on him, and he stated that he could not.   One of the reasons given by him was because it was

dark and too high for him to go around and see.   He was
then asked the question objected to, and in admitting the
question the presiding justice said, "I will admit it on the
ground that it bears on the question of what he could see at
the time."   We think the question was proper in the cir-
cumstances stated.   The defendant takes nothing by this
exception.

(9)     The second exception was taken to Q. 39 on page 155 of
the transcript.   This was a question asked of one of plain-
tiff's expert witnesses.   The transcript in this connection
is:   "Q. 37. Do you know whether the stirrup hook is
customarily used in connection with molds?   A. It is.
Mr. Van Slyck:   That is not the question that was asked—
I ask to have the answer stricken out.   He was asked if he
knew the fact and then, instead of answering yes or no, he
says, "it is."   Mr. Barney:   It was not responsive, of
course.   The answer would be yes or no.   Q. 38. This
question is as to the fact, whether or not you did know
that it is?   The question of the fact, the knowledge; do
you know whether or not it is customarily used?   A. Yes.
Q. 39. Now, is it?   Mr. Van Slyck:   Objected to.   The
Court:   You may answer.   (Defendant's exception noted.)
A. Yes, sir."   This court has repeatedly decided that such
evidence is admissible.   *Wilson* v. *N. Y., N. H. & H. R. R.
Co.*, 29 R. I., 146 at 166; *Benson* v. *N. Y., N. H. & H. R. R.
Co.*, 23 R. I. 147; *Laporte* v. *Cook*, 22 R. I. 554 at 556.   The
rule is stated as follows in 26 Cyc. 1108:   "While not con-
clusive on the question of negligence, evidence is generally
admissible in an action for personal injuries to show whether
or not the master's machinery, appliances, ways and methods
are such as are in ordinary and common use by others in the
same business."

The third exception was to a like question asked of another
of plaintiff's experts, James Bowie, as appears on page 168
of the transcript:   "Q. 16. And when handled by trunnions
will you state whether or not it is customary to use the same
kind of a hook as you found in East Providence?"   The

defendant takes nothing by this exception as the question was admissible under the cases cited above. The trial justice instructed the jury with regard to the duty of the master in cases of this kind, and there were no exceptions taken thereto.

(10)    The fourth exception appears on page 169 of the transcript and is based upon an objection to a question asked of Mr. Bowie, as follows: "Q. Would a bail hook be as safe for use in handling these ingot molds as the stirrup you refer to as used elsewhere? A. I shouldn't consider it safe. (Objected to by Mr. Van Slyck. Objection overruled. Exception taken.)" The question was properly admitted. *McGar* v. *National & Providence Worsted Mills*, 22 R. I. 347, 353.

(11)    The defendant excepted to the denial of its third request to charge, page 299 of the transcript: "The evidence fails to show that the tipping of the mold in question was caused either wholly or in part by the breaking loose of the brick bottom or base before the mold tipped over and the plaintiff cannot recover upon the counts in the declaration in which the cause or one of the causes of the tipping of the mold is alleged to have been the breaking loose of the brick bottom or base." This request embodied an issue of fact which it was the province of the jury to decide. The request was rightly denied.

Defendant excepted to the denial of its ninth request, page 300 of the transcript: "That a mold of the apparent weight of the mold in question would be liable to injure any person upon whom it fell must have been evident to any person of ordinary or average intelligence who saw the mold and its operation. It must have been equally apparent that the proper way to avoid injury in case of the fall or tipping over of the mold was to step out of the line of fall, and the testimony shows that the plaintiff had ample space in which to step clear of the mold as it tipped over. The evidence shows therefore no violation by the defendant of the duty to warn or instruct." This request was properly denied.

Its subject matter has to do with the evidence adduced in the case, which it was the duty of the jury to pass upon under instructions from the court. The testimony shows that the plaintiff was working between the second mold and the side of the pit at the time he was injured. It is in evidence that there was room for four molds widthwise the pit, and that two had been set at the time. On account of the smallness of the space these molds were set together, and it was variously estimated that the distance between the trunnions was from one-half inch, as testified by defendant's witnesses, to two inches, as testified by plaintiff's witnesses. The molds were over five feet high and weighed 1,950 pounds. One-half the space widthwise of the pit was occupied by the fifth and sixth molds, and there was evidence as to the space left where plaintiff was working at the time he was injured. , The testimony shows also that the top of the mold as it toppled over pinioned plaintiff's right arm to the side of the pit. The jury saw the pit, they saw the molds, they saw the space between the pit plates and between the molds as they were set, and they heard plaintiff's testimony as to what happened at the time he was injured, and his testimony as to how he sustained his injuries. With this evidence before them it was their duty to pass upon it.

Defendant excepted to the denial of its tenth request, on page 301 of the transcript: "The evidence fails to show any violation by the defendant of the duty to furnish the plaintiff with a safe place to work as charged in the eighth count of the declaration. Upon the evidence, the plaintiff had ample room in which to avoid the falling or tipping mold." This request was properly denied for the same reasons set forth above in considering the exception to the denial of defendant's ninth request to charge.

(12)   In its seventeenth request, page 302 of the transcript: "Upon all the testimony, the verdict of the jury must be for the defendant," the defendant asks the court under the

guise of a request to charge, to direct a verdict for defendant. This request was rightly refused.

The plaintiff produced the testimony of six witnesses, exclusive of his own testimony and that of his medical experts. Of these six witnesses, two were experts and the other four comprised all the other members of the pit gang, with the exception of Leary. The only testimony introduced by the defendant to meet the evidence adduced by the plaintiff was that of two of its employees, defendant's day foreman and defendant's night foreman, neither of whom was present at the time the plaintiff was injured. The evidence showed that the crane took the mold over to the pit, and that the plaintiff was in the pit. The crane swung and lowered the mold over the plate where the mold was to set. Plaintiff put his right hand at the top of the mold and with his left hand took hold of the handle of the mold, using, on account of the excessive heat of the mold, pieces of bagging upon his hands. The plaintiff directed the crane man to lower the mold, and upon being lowered it was not straight, the trunnions not being in line, and plaintiff signalled that it be raised. Then it was lifted, and when it was in a correct line plaintiff signalled that it be lowered. When lowered the second time it fell over on him, pinioning his arm between the wall of the pit and the mold. The men there tried to pry the mold off his arm with a bar, but were fearful that it might fall on another part of his body. Two of the men then jumped into the pit and placed the hooks on the mold and it was lifted off plaintiff's arm. When the hooks were attached and the mold lifted, plaintiff testified that he saw a piece of brick where the mold should have set, that the brick in question belonged in the bottom of the mold and was not on the plate before the mold was lowered the second time.

Charles J. Johnson, sub-foreman of the pit gang, testified that at the time the plaintiff was injured plaintiff had placed the mold and found it a little out of the way, and when it was being lowered the second time it tipped over, that the

brick bottom dropped out and was on the plate upon which the mold was to set.

Gustave Anderson, another of the pit gang, testified that the brick came out as the mold was being lowered, and the mold fell on plaintiff, that he saw the brick and that it was on the mold plate. Witness described the appearance of the brick as being square, and identified one similar to it.

Victor Benson, another of the pit gang, testified that the reason the mold fell over was because the brick bottom fell out. He saw the bottom when the mold was raised and also saw that the hooks had come off the trunnions.

August Johnson, the crane operator, testified that plaintiff had placed molds in the first row and was placing the second mold in the second row when he was injured. The first time the mold had been so lowered it was too close to the first mold in that row, and he received the signal to lift it a little, which he did, and the second time he lowered it the mold tipped over. He saw the plaintiff's arm was caught between the wall and the pit, and then he saw the brick bottom that had been in the mold was left on the plate in the pit. He also testified that when the mold tipped over the hooks came off. He also testified that if there had been some arrangement to hold the hooks on to the trunnions he could have controlled the mold and have raised it. With the hooks off the trunnions, however, there was no way that he could stop the fall of the mold or raise it from the plaintiff after it had fallen upon him. He was thirty-five feet above the pit.

Charles Johnson and Gustave Anderson also testified that the hooks were off the trunnions when the mold tipped over.

Johnson and Leary replaced the hooks on the trunnions so as to lift the mold off the plaintiff.

In cross-examination, defendant's foreman, John Pahlane, testified that for a year prior to the time the plaintiff was injured he had known these brick bottoms to fall out when the mold was being lowered into the pit, on an average of probably once a week.

August Johnson testified that he had seen molds tip over several times during the nine years he was in defendant's employ, by reason of a brick bottom coming out of a mold and the mold striking upon it.

Victor Benson testified that prior to the time Chobanian (plaintiff) was injured, he had seen molds which were being put into the pit tip over by reason of the brick bottom falling out of the mold and the mold striking on the brick. He testified that this had happened many times during the time that he was working there.

Plaintiff testified that he had no knowledge that the brick bottoms were apt to fall out and was never warned relative to the same. No testimony was adduced to show that the plaintiff had any such knowledge.

The hooks used were made by defendant in its blacksmith shop.

The plaintiff introduced the testimony of two experts. One of them, James Bowie, had been engaged in foundry work for over thirty-eight years and at the time he testified was a foundry superintendent. The other, James A. McKenna, is a construction engineer in the employ of the City of Providence and has had experience in the line of work in question covering a period of twenty-five years.

James A. McKenna testified that during his twenty-five years of familiarity with this line of work he had visited foundries where like work was done and like kinds of molds used, in various parts of the country; that he was familiar with the different apparatus used in the foundries; that none of the concerns where like work was performed used the kind of hook that the defendant used; that the kind of hook used by defendant was not a proper kind of hook to use because it was an unsafe hook for that work. In describing the character of defendant's hook, the witness said: "They were not safe, that they were what is called bail hooks—one side of the hook would free itself if the crane man was to drop it a half an inch; the other would free itself if the crane man dropped it $\frac{5}{8}$ of an inch. The crane man was 35 feet

away, or thereabouts, and he had to govern that $\frac{5}{8}$ of an inch, and half an inch, from where he was, away up in the air. He might drop the crane $\frac{5}{8}$ of an inch lower than it should be and the hooks would become disengaged." Witness testified that a stirrup hook should be used on a trunnion of that kind. In describing the stirrup hook that should be used upon that class of work, witness said, this hook has "An eye and the bottom part of the eye is a little elongated and drops down a little bit so that when the crane reaches the mold the trunnion is engaged in the lower part of the stirrup. It could go up or down like that, but it won't come off. . . . It has got it there all the time so that if the mold was tipped over, you still have got it in a direct way, the crane, when you could pull it right back again." The witness testified that the stirrup hook remains on the trunnion until the operator takes it off, and is put on and taken off by hand. Witness testified that a stirrup hook is the kind of a hook that is customarily used upon molds and trunnions of the kind that defendant used in its foundry. He further testified in cross-examination that the same kind of a mold was used to his knowledge at the John A. Roebling Company, Trenton, N. J., but the Roebling concern used a stirrup hook and not a bail hook. Witness testified in cross-examination that the Bethlehem Works at Cambria, another large foundry, used this same kind of molds with stirrup hooks.

James Bowie, a foundry superintendent, testified that he had been in the foundry business for thirty-eight years, and had visited foundries all over the country. He testified that he was familiar with ingot molds and had seen them handled by trunnions many times. He also testified that he had never seen at any other place the kind of hook used by defendant upon its trunnions, that stirrup hooks were always used in every place that he had seen like work performed. Witness described the hook used by defendant at its foundry as follows: "It is the most nondescript hook I ever saw. It was a little car and cart hook, a little turn up on it, and the other hook hasn't any turn up on it. It is not an S hook, purely an S hook. It might be called a

bail hook.'' Witness testified that the hook used by the defendant was an unsafe hook for that work.

Upon the question of the hooks, John Pahlane, foreman of the defendant, testified that his experience consisted of the following: Worked for a while in Sweden, then went to work in a steel foundry in Worcester, Mass., where he worked for four years from 1887 to 1891, and in the latter year came to East Providence to work for defendant and has been in its employ ever since. The witness testified that he was familiar with stirrup hooks, and that the stirrup hook could not be used at defendant's foundry, giving as his reasons that the pit was too deep to put them on and off, and also that a stirrup hook might catch on to the adjoining mold and tumble it down. He gave as his opinion, in answer to question of defendant's counsel, that the hook that defendant uses is safer than the stirrup hook. The witness said that the stirrup hook would stay on until taken off by hand, and that this would enable the crane man to have control of the mold if it started to tip. In explaining why he thought a stirrup hook might tip an adjoining mold over by coming in contact with it, he said this was because the molds were so close together. He admitted, however, that this same thing might occur in connection with the use of the present hooks that defendant uses if one of them should hit the adjoining mold. He claimed, however, that even if the stirrup hooks could be put on and off the trunnions all right in the pit, they could not be taken off and put on when the mold was upon the floor.

Charles Sundstrom, the defendant's other foreman, testified that the distance between the trunnions as the mold set in the pit was less than one-half inch. This statement was contradicted by James Bowie and James A. McKenna, who each testified that the distance was two inches.

Pahlane's testimony as to the hooks was contradicted by James Bowie and James A. McKenna, who were recalled to the stand. Mr. Bowie testified that stirrup hooks could be used all right upon defendant's trunnions; that there would

be no difficulty in placing a properly constructed stirrup hook
on the trunnions and that there was ample room between the
molds.   The witness testified further, in contradiction of the
witness Pahlane that there would be no trouble in placing
the stirrup hooks on the molds when the molds were on the
floor of the foundry.   Witness testified that there was no
chance of engaging another trunnion in taking the hooks
off, with two inches between the trunnions, if ordinary care
was used.   The witness said that upon defendant's molds
a stirrup hook could be made either of round or flat iron; if
the former, they could be made one-half inch thick; and if
of the latter, five-eighths of an inch thick.

James A. McKenna testified, in answer to witness Pah-
lane's statements, that stirrup hooks could be put on and
taken off all right.   He further testified that if the molds
were on the ground, the stirrup hooks could be put on and
taken off without any trouble.   Witness contradicted Pah-
lane's statement that the stirrup hook would be dangerous
because in taking it off it would be liable to catch on a trun-
nion alongside of it, and testified that on the contrary such a
thing would be almost impossible to happen because a
stirrup hook could not catch the adjoining trunnion except
at one point and that would be directly opposite the opening
in the eye.   There is no danger, the witness said, of the
stirrup hook being hooked into the opposite trunnion by the
operator who was removing it, as claimed by Pahlane,
unless that person actually put it on the other trunnion by
hand.   Witness said that the kind of hook used by defendant
at the present time is more likely to catch on another trun-
nion, since it is an open hook and moves around.   ·

The testimony showed that nobody in particular put the
brick bottoms into the mold, that some of the brick bottoms
came too large and had to be cut, that the men cut them with
a hammer, that sometimes the bricks came too small, in
which cases large wedges were used, that sometimes the
workmen chipped the brick with a hammer to make it go
into the mold, that some of the bricks were used three or

four times, that all the bricks were supposed to be of the same size, but were not. One of the witnesses testified that they had to break bricks in order to get them into the mold. And for this purpose they used a hammer, and if there were no hammers a hatchet was used. Witnesses introduced by the plaintiff testified that any kind of a wedge was used, and any and every kind of wood was used for wedges; that no particular kind of wood was supplied, and the men used · wood picked up in the carpenter shop; that sometimes matches were used for wedges; that the wedges were shaped up sometimes with a hatchet and sometimes with a knife; that sometimes when a soft wedge was used in a hot mold, the wedge burned out and the brick bottom would fall out of the mold. Charles Johnson, a sub-foreman, testified that no iron or steel wedges were ever used. He said that they made wedges out of anything that they could get hold of. In making wedges anything that would sharpen a piece of wood was used. Gustave Anderson testified that when they cut too much off a brick, they drove a piece of wood to wedge the brick in. James A. McKenna testified that steel and iron wedges were used elsewhere for wedging in connection with molds. James Bowie testified that he had never seen wooden wedges used with this kind of a mold. Mr. Bowie further testified that the heat of the mold would affect the wood.

The testimony showed that the plaintiff was engaged in the course of his employment when he was injured. The plaintiff testified that the foreman directed him to go into the pit, and that he was told to put the molds in position. He said that he was ordered to do this before he was injured; that the foreman told him to do all and every kind of work that the other employees there were doing, including the work in the pit. It was one or two days before he was hurt that he was told to do pit work. He did not go into the pit upon the day he went into the foundry, because it did not come his turn to do the work. The men took turns putting the molds into the pit, and there were five men

to take turns.  Each set the molds in the pit before the next man's turn came.  Witness said he went into the pit because it was his turn, and he previously had been ordered by the boss so to do.  There was more than one pouring that night.  There were on an average two pourings a night; sometimes more.  In order to set the molds it was the duty of the workmen to go into the pit.

August Johnson, the crane man, testified as follows: "Q.  Where was Chobanian when he was injured?  A.  Down in the pit.  Q.  What doing?  A.  Placing the molds. Q.  Was that part of his work?  A.  Yes."

Charles Sundstrom was night foreman and was up in the furnace room at the time Chobanian was injured.  Sundstrom testified that when he was absent from the pit room Charles Johnson, who was the oldest pit man, was in charge of the pit gang as foreman in his place.  Johnson was asked the following questions: "Q.  Was he, Chobanian, working in the regular way that night in the pit?  A.  Yes, he was. Q.  And that is where the men had to go at that time to set the molds in the pit, was it not?  A.  Yes."  In cross-examination he was asked:  "Q.  What do you mean by the statement that Chobanian was working in the regular way in the pit?  A.  He was doing—he was taking his turn to do the work the same as we did."

Gustave Anderson testified that he was one of the five pit men.  He further testified: "Q.  Chobanian was a spare man?  A.  Yes.  Q.  What is the duty of a spare man? A.  He got to do the same thing what we do.  Q.  And this night when he was injured was he taking his turn on the work?  A.  Yes.  Q.  In the pit?  A.  Yes.  Q.  And was that the way the work was done going down into the pit? A.  Yes.  Q.  The other men were taking their turn and Chobanian was taking his?  A.  Yes."

Charles Sundstrom testified that at the time Chobanian was injured he was a spare pit man when anybody was out. He further testified that Chobanian had previously been a scrap man and they always took the oldest scrap loader and

put him in the pit if he was able to do it, when there was a vacancy. "Q. What do you mean by putting him into the pit? A. Well, if there was a man sick or anything in that way, we had to take the spare man and put him in his place. Q. Do you mean by 'pit' those holes that are dug in the ground? A. Yes. Q. Did you put Chobanian into the pit? A. Yes." Witness testified that the night Chobanian was injured, five men comprised the pit gang; that their names were Charles Johnson, Victor Benson, Gustave Anderson, Harry Leary and Chobanian, and that these five men took on the work. Witness further testified that each of these pit men was expected to take his turn setting the molds, putting in bottoms in the molds and cleaning the pit, and work of that character.

Where there is conflicting testimony, it is the peculiar province of the jury to say what testimony they will believe. By their verdict in this case, they have shown that they believe the testimony of the plaintiff and his witnesses. The jury saw the witnesses, observed their deportment upon the witness stand, the manner in which their testimony was given, and their degree of intelligence—all of which constituted important considerations in determining the weight to be given to the testimony.

The defendant's motion for a new trial was denied by the justice who presided at the trial, who also had the advantage of seeing the witnesses and hearing the testimony. The verdict is supported by the evidence.

(13)    The plaintiff was at the time of the injury a robust man thirty years of age and was earning about $14 a week. His right arm was so badly burned as to necessitate its amputation. He suffered the most excruciating pain at the time of and long after the accident. He has not been able to work since. The medical testimony was to the effect that he had suffered a severe and probably permanent shock to his nervous system and that he would probably continue to suffer pain for the rest of his life. The damages given by the jury, $11,916, do not appear to us to be excessive.

The defendant's exceptions are overruled and the case is remitted to the Superior Court with direction to enter judgment upon the verdict.

Blodgett, J., dissents.

*Francis I. McCanna, Barney & Lee*, for plaintiff.
*C. M. Van Slyck, Frederick A. Jones*, for defendant.