**ATHERTON et al. v. ANDERSON.**

No. 7298.

Circuit Court of Appeals, Sixth Circuit.

Nov. 11, 1936.

W. W. Crawford and Churchill Humphrey, both of Louisville, Ky., and Newton D. Baker, of Cleveland, Ohio (Charles G. Middleton, A. C. Van Winkle, T. Kennedy Helm, and Edw. A. Dodd, all of Louisville, Ky., Howard F. Burns, of Cleveland, Ohio, and Henry E. McElwain, Jr., John C. Doolan, Graddy Cary, Herman H. Nettelroth, J. Wheeler Campbell, Huston Quin, Herman G. Handmaker, Thomas A. Barker, and Henry J. Tilford, all of Louisville, Ky., on the brief), for appellants.

Eugene P. Locke, of Dallas, Tex. (E. B. Stroud, Jr., and Maurice E. Purnell, both of Dallas, Tex., Arthur Peter and John G. Heyburn, both of Louisville, Ky., Locke, Locke, Stroud & Randolph, of Dallas, Tex., and Peter, Heyburn, Marshall & Wyatt, of Louisville, Ky., on the brief), for appellee.

Before HICKS, SIMONS, and ALLEN, Circuit Judges.

SIMONS, Circuit Judge.

For losses sustained by a closed national bank in consequence of acts, ultra vires, and excessive loans, a decree was entered awarding the bank's receiver damages against its officers and nonofficer directors. The latter were assessed varying sums aggregating approximately $4,000,000, and they alone have appealed.

The suit was in equity by appellee's predecessor as receiver appointed by the Comptroller of the Currency under the National Banking Act. The bill counted both upon breach of statutory duty and upon common-law negligence. The cause was referred to a master, who after extended hearings made an exhaustive report upon the voluminous testimony, with findings of fact and conclusions of law. Though he recommended a decree against nonofficer directors for damages aggregating upwards of $500,000, yet in respect to the transactions for which liability was by the decree adjudged, exonerated them of common-law negligence or knowing and intentional violations of the statute. Exceptions were taken by both receiver and appellants. Those of the latter were in all respects sustained, while those of the former were sustained in so far as they related to alleged violations of the Banking Act in the transactions here reviewed. In respect to them, there was no finding that the appellants were negligent.

In the principal opinion in the case (7 F.Supp. 924, 959), the court directed that, "Except as hereinbefore otherwise indicated, the report of the master will be confirmed." It was undoubtedly in response to this direction that section 55 was incorporated in the decree. It is as follows: "All claims asserted by the plaintiff in the bill of complaint as amended, other than those hereinbefore specifically adjudged in plaintiff's favor, are hereby adjudged in favor of the defendants respectively, and the bill of complaint as amended is hereby dismissed as to all other such claims, as to the respective defendants against whom such claims were asserted." The plaintiff did not appeal. In this situation it becomes necessary at the outset to define the scope of this review, and to ascertain precisely the questions here involved.

■ It is clear that the duty which rests upon directors of a national bank by reason of the provisions of the National Banking Act are entirely separate and distinct from the duties imposed upon them by the common law, Yates v. Jones National Bank, 206 U.S. 158, 27 S.Ct. 638, 51 L.Ed. 1002; Jones National Bank v. Yates, 240 U.S. 541, 36 S.Ct. 429, 60 L.Ed. 788, and, "it is obviously possible that a director may neglect one or more of the former, and not any of the latter, or vice versa" (Bowerman v. Hamner, 250 U.S. 504, 511, 39 S.Ct. 549, 551, 63 L.Ed. 1113), though "there is no sound reason why a bill may not be so framed that, if the evidence fails to establish statutory negligence, but establishes common-law negligence, a decree may be entered accordingly," to which the court significantly added, "and thus the necessity for a resort to a second suit avoided."

■ Notwithstanding section 55 of the decree and his failure to appeal therefrom, the appellee urges upon us the negligence issues raised below, first, upon the ground that since appeals in equity bring up the whole case, the decree below should be sustained if right for any reason; and, second, on the ground that the negligence counts were not disposed of in the District Court. We are, of course, familiar with the principle invoked governing reviews in equity, and have uniformly applied it. Mills Novelty Co. v. Monarch Tool & Mfg. Co. (C.C.A.) 49 F.(2d) 28, 29; A. O. Smith Corp. v. Petroleum Iron Works Co. (C.C.A.) 73 F.(2d) 531, 538. We think, however, that the appellee confuses reasons for decision with causes of action, which arise only because of the invasion of some essential primary right of the plaintiff or breach of some duty by the defendant. It is quite clear that where an appellee defends a decree he may do so not only upon the grounds upon which it was based, but also upon all grounds urged below, Langnes v. Green, 282 U.S. 531, 51 S.Ct. 243, 75 L. Ed. 520, but to press a cause of action foreclosed by the decree is to seek to overthrow it and not to defend it.

■ The identity of the circumstances under which two distinct primary rights, or from which separate and distinct liabilities arise, does not preclude recognition of separate and distinct causes, for "separate causes of action may arise out of the same transaction, in which event a recovery or judgment in an action on one does not ordinarily bar an action on the other." Freeman on Judgments (5th Ed.) § 594, so "if two separate and distinct primary rights could be invaded by one and the same wrong, or if the single primary right should be invaded by two distinct and separate legal wrongs, in either case two causes of action would result," Pomeroy Code Remedies (5th Ed.) 367, cited with approval in United States v. Pan-American Petroleum Co., 55 F.(2d) 753, 777 (C.C.A.9), certiorari denied, 287 U.S. 612, 53 S.Ct. 14, 77 L.Ed. 532. Where rights arise under the laws of distinct sovereignties, a judgment based upon the violation of the one is no bar to a suit upon rights declared under the other,

and the identity of parties, subject-matter and the extent of the relief to be granted is not controlling. Troxell, Administratrix, v. Delaware, Lackawanna & Western R. R. Co., 227 U.S. 434, 33 S.Ct. 274, 57 L.Ed. 586. This is in harmony with the rule applied to crimes that an act denounced by both national and state sovereignties is an offense against both, and may be punished by each, notwithstanding constitutional immunity against double jeopardy. United States v. Lanza, 260 U.S. 377, 43 S.Ct. 141, 67 L.Ed. 314. While the broad language of the Troxell Case was somewhat limited in Baltimore S. S. Co. et al. v. Phillips, 274 U. S. 316, at page 321, 323, 47 S.Ct. 600, 602, 71 L.Ed. 1069, the principle was not denied, the court saying: "A cause of action does not consist of facts, but of the unlawful violation of a right which the facts show. The number and variety of the facts alleged do not establish more than one cause of action so long as their result, whether they be considered severally or in combination, is the violation of but one right by a single legal wrong. The mere multiplication of grounds of negligence alleged as causing the same injury does not result in multiplying the causes of action. 'The facts are merely the means, and not the end. They do not constitute the cause of action, but they show its existence by making the wrong appear. "The thing, therefore, which in contemplation of law as its cause, becomes a ground for action, is not the group of facts alleged in the declaration, bill, or indictment, but the result of these in a legal wrong, the existence of which, if true, they conclusively evince." ' Chobanian v. Washburn Wire Co., 33 R.I. 289, 302, 80 A. 394, 400, Ann. Cas.1913D, 730." So is clarified the excerpt we have quoted from Bowerman v. Hamner, supra, "And thus the necessity for a resort to a second suit avoided."

■ The contention that the purpose of section 55 of the decree was merely to dismiss claims based on transactions neither negligent nor violating the statute and was without reference to charges of negligence in the transactions which led to findings of statutory liability alone, must be rejected. The case was pleaded and tried as one involving causes of action based upon violation of the statute, and other causes based upon common-law negligence. It was so analyzed in the report of the master. When the court came to enter a decree against the officers as distinguished from nonofficer directors, it granted recovery in relation to each transaction, both for staatutory viola-

tion and for common-law negligence. Finally, since the court specifically ordered that the report of the master would be confirmed except as otherwise indicated, section 55 must be response thereto, since there is no other, and the opinions are incorporated in the decree by its terms (section 59) in respect to the sustaining and overruling of exceptions.

We conclude, therefore, that no question of common-law negligence as such is presented to us for review, and that the case as submitted involves in respect to each transaction in issue the sole question as to whether there has been a breach of statutory duty imposed upon the directors by the National Banking Act.

■ It becomes necessary to consider another contention of general application. It is, of course, the rule (Equity 61½, 28 U.S. C.A. following section 723), that in reference to a master his report shall be treated as presumptively correct, and may be modified or rejected by the court only when in the exercise of its judgment it is fully satisfied that error has been committed. It is urged, however, that since the order of reference recited that the report of the master was to be advisory only, little weight need be given his findings. To what extent this weakens the presumption of correctness that attaches to them would be difficult to say. Certainly the court must even in such circumstances consider the superior opportunities of the master who heard and saw the witnesses to appraise their credibility and to harmonize conflicting testimony. In practical application perhaps there is little difference between saying the master is presumptively correct and saying that his findings are purely advisory, especially when as here the master is specially selected for exceptional ability to aid the court in a peculiarly complicated and difficult case. His advice is not lightly to be rejected, whatever the formula. Moreover, it happens upon this record that there is little conflict between master and court on evidentiary facts. Since concurrent findings of court and master will not by us be set aside except for clear mistake, in the usual case, it will follow in this that whatever in persuasiveness the master's findings lose by the advisory recital in the order, by just so much do the court's findings gain, and the result is the same.

The history of the National Bank of Kentucky dates back to the incorporation of the Bank of Kentucky in 1834. It was

reincorporated under the National Banking Act in 1900, consolidated from time to time with other banks with continuing increases of its capital and surplus until at the time of the transactions here involved its combined capital stock and unimpaired surplus aggregated $6,000,000. For a number of years prior to the period here considered, it had enjoyed substantial prosperity, and had paid large dividends to its stockholders. On November 16, 1930, it was closed by action of its directors and a receiver for it was shortly afterwards appointed by the Comptroller. On March 30, 1931, the receiver filed his bill in equity against the directors, including officers, to recover for losses claimed to have been sustained by the bank through acts, ultra vires, and through excessive loans.

Something must be understood of the size, manner of organization, and volume of business of the bank in order to place the acts of the accused directors in their proper setting. The National Bank of Kentucky was the largest bank in the South. Its total resources were over $52,000,000. It had more country bank customers than all other banks in Louisville combined. Its weekly loan list contained on an average the names of about 500 borrowers. There were 200 employees, of whom at least 150 were engaged daily in keeping a record of the bank's transactions. The method followed by the defendants in administering the bank's affairs is fully described in the principal opinion below, 7 F.Supp. 924. All loans of $5,000 and over were required to be submitted to a loan committee of eight members having charge of loans and investments, and approval of at least five members was required before any loan or investment could be made. Each loan coming before the committee was recorded, and under rules adopted by the board loans of $20,000 and over were required to be recorded in alphabetical order in what was called the "$20,000 and Over Book," which was brought to the directors' meeting on the first of each month. It was the duty of the cashier to read to the directors all loans of $50,000 or more appearing thereon, so that the book was sometimes referred to in the record as the "$50,000 and Over Book." The bank was so large that it was necessary to divide it into departments and to place an officer at the head of each, giving him superintendence and control of all matters within its jurisdiction and scope. These were the discount, collection, exchange, individual bookkeeping, country bank, trans-

it, paying and receiving, collateral, safety vault, and other departments. Once in each year audit of the bank's books was made by Humphrey Robinson & Co., clearing house accountants, of Louisville. In addition the bank had its own auditing department with an efficient auditor at its head whose duty it was to make report to the cashier. The auditor had general authority to go into any department of the bank at will and to audit its books and records. His authority in that respect was as complete as that of the National Bank Examiner.

During the period with which we are concerned Brown was president of the bank and Jones its cashier. The master found that the directors were unusually regular in attendance upon the board meetings, and more interested in the bank than ordinary directors. They had implicit confidence in Brown and other officers, and trusted them just as the public generally in Louisville trusted them. While rejecting certain ultimate conclusions, the court accepted the preliminary findings of the master that Brown, the president of the bank, aided by Jones, its cashier, had throughout the period of time here involved deliberately, systematically, and for the purpose of assisting Brown to abstract substantial sums from the bank and otherwise to further his own interests at the expense of the bank, concealed from nonofficer directors communications from the Comptroller of the Currency, reports of bank examiners and auditors, circumstances indicating the character of loans and investments, and other facts which would have apprised the directors as to the true relation of the bank to the various loans and investments herein involved. A careful examination of the record made it clear to the court that except as otherwise indicated, there was substantial evidence to support the findings of the master in the respects indicated, giving such consideration to the opportunities for personal observation enjoyed by the master and his superior facilities for discovering the truth. It was further the conclusion of both master and court that no misconduct or bad faith on the part of any of the nonofficer directors had been shown. Certainly there is no suggestion in the record that any of the appellants profited or expected to profit personally, either directly or indirectly, by any of the unlawful acts upon which the decree is based. With the issues uncomplicated by questions of negligence, and decision uninfluenced by any suggestion of fraudulent conduct on the part of the appel-

524

lants, we are free to consider the alleged violations of the Banking Act, to determine what is thereby specifically prohibited, and from established evidentiary facts to draw such inferences as seem clearly indicated, having in mind that there has been no exoneration of the bank or its officer directors by either master or judge, since the latter have been found liable for all losses sustained in respect to transactions here involved, and on their behalf there has been no appeal.

The transactions which furnished the bases for liability imposed by the decree comprise: (1) The purchase and operation by the bank of the business of the Kentucky Wagon Manufacturing Company, held to be ultra vires; (2) loans to Wakefield & Co., which, when aggregated with loans made to employees and officers of that company, were held to be excessive; (3) loans to Murray Rubber Company, which when aggregated with certain bonds of that company held by the bank were held to be excessive; (4) loans to Norman & Co., likewise held excessive; and (5) loans upon the shares of the Banco Kentucky Company, which by reason of the fact that the latter held a large amount of trust participation certificates evidencing an interest in the shares of the bank were held to be in effect loans by the bank upon the security of its own shares.

Kentucky Wagon Manufacturing Company.

This company had been for a long time successfully engaged in the manufacture and sale of wagons and other vehicles in the city of Louisville. Its business had, however, fallen off largely because of the growing demand for motor vehicles. In 1921 or 1922 a merger was effected between the Wagon Company and a number of other corporations which resulted in the creation of a corporation called Associated Motors Corporation (later National Motors Corporation). With the details of the merger we are not concerned, except that title to the Wagon Company's plant and inventory to the value of $1,725,760.01 passed to National Motors, although possession remained in the Wagon Company. Title to the Wagon Company's inventory to the value of $1,060,000 remained with it. In June, 1924, the Kentucky Wagon Manufacturing Company and National Motors Corporation were both adjudicated bankrupt. At that time the Wagon Company owed the bank approximately $500,000, and National Motors Corporation owed it upwards of $300,000. The Kentucky Wagon Company had received for its plant and that part of its inventory sold to National Motors first mortgage bonds, collateral trust notes, unsecured notes, and preferred stock, while National Motors assumed debts of the Kentucky Company to the extent of $1,300,000. Some of the bonds had been transferred to the bank, and the bank held additional bonds as collateral to advances made to National Motors. The properties of these two companies located in Louisville consisted of land, plant, and equipment valued at $2,383,000, inventory transferred to National Motors valued at $1,725,000, and inventory retained by the Wagon Company valued at $1,060,000.

The bank was manifestly faced with the problem of either taking its then present loss or considering some reasonably feasible and permissible plan to reduce or eliminate it. To have remained idle, to have awaited speculative results of a bankruptcy sale was a course not dictated by prudence or sound business judgment, and to have refused to consider any reasonable plan for saving the going concern value of the wagon works might indeed have submitted its directors to charges of negligence, for both district judges who had supervised the bankruptcy proceedings had ordered the receivers to continue operations to save going value. It was at this juncture that Judge Alexander P. Humphrey, general counsel for the bank and a member of its board of directors, an able lawyer,[1] submitted a plan for salvaging of the bank's loan. It does not appear that any other or better plan was ever suggested. The bank was to purchase the local claims against both the Kentucky Company and National Motors. An offer of composition had already been made by the Kentucky Company and had been rejected. An amended offer of 25 cents upon the dollar was pending when the plan was adopted. By the purchase of the local claims it was expected that the bank would acquire an undivided right to the inventory retained by the Kentucky Company, and since many of the creditors also held first mortgage bonds of National Motors, the bank would be able by adding such bonds to those already held to buy in the local plant free from all other claims of bondholders and to sell it as a going concern. The plan was approved by the directors, and executed as proposed, ex-

[1] "He was one of the ablest lawyers of my time, of fascinating attractiveness and leadership, a patriot and ideal citizen." Chief Justice Taft in 225 Ky. XI.

cept that pending foreclosure proceedings against National Motors property were delayed through no fault of the bank and title to the land, plant, and equipment was not perfected until December 28, 1927. In the meanwhile a new corporation had been organized in Delaware, to take over the inventory originally retained by the Kentucky Company and its other property when the title should be acquired.

The alleged ultra vires character of the bank's activities in respect to the Kentucky Wagon Manufacturing Company resolves itself into two phases, and bears upon the liability of two different groups of directors —those who were members of the board at the time the property was acquired and those who came on the board in April, 1927, when the bank was united with the Louisville Trust Company [see Laurent v. Anderson, 70 F.(2d) 819 (C.C.A.6)], though the court held both equally liable. In its first phase the question seems to be whether the bank had authority to acquire the Wagon Works and to organize a corporation to operate it, assuming its purpose to be as was found by the master to salvage its debt by saving going concern value. The second phase concerns liability of directors, both old and new, in continuing the operation of the Wagon Works for a number of years after efforts to sell it as a going concern had proved futile and while it was losing money which the bank was compelled to supply.

▇▇▇▇ It is true that a national bank has no authority to engage in or promote a purely speculative business or adventure. First National Bank v. Converse, 200 U.S. 425, 26 S.Ct. 306, 50 L.Ed. 537. It has generally been thought, however, and we think the view is nowhere seriously disputed, that a bank has implied power when faced with a loss growing out of a legitimate banking transaction to acquire stocks or other property when it is honestly believed at the time that under more favorable circumstances a loss which would otherwise accrue might be averted or diminished. Banks may do in this behalf whatever natural persons may do under like circumstances. First National Bank of Charlotte v. National Exchange Bank of Baltimore, 92 U.S. 122, 23 L.Ed. 679. As an incident to the exercise of the power of a bank to collect its debts is the right to secure and save the debt. Roebling v. First National Bank, 30 F. 744 (D.C.W. Va.), and a bank may lawfully do many things in securing and collecting its loans,

in the enforcement of its rights and in the conservation of its property previously acquired, which it is not authorized to engage in as a primary business. Morris v. Third National Bank, 142 F. 25 (C.C.A.8), cert. denied 201 U.S. 649, 26 S.Ct. 762, 50 L.Ed. 905; Bailey v. Babcock (D.C.) 241 F. 501; California Nat. Bank v. Kennedy, 167 U.S. 362, 17 S.Ct. 831, 42 L.Ed. 198. Compare Cockrill v. Abeles et al., 86 F. 505 (C.C. A.8). "When a national bank has lawfully acquired real estate or other property, it may sell that property and convert it into money; and, in order to do so, it may clean it, make reasonable repairs upon it, and put it in presentable condition to attract purchasers, in the same way that an individual of sound judgment and prudence would do if he desired to make a sale of the property. * * * The duty of exercising this power is imposed upon the directors and officers of such a bank, and the authority to determine in the first instance when and to what extent it shall be exercised is necessarily entrusted to their judgment. Moreover, they cannot escape the discharge of this duty. They are bound to consider and decide the question at their peril. It follows that, when they have honestly and carefully considered and decided it, they ought not to suffer because, in the light of subsequent events, which could not be foreseen, it turns out that their decision was unfortunate." Cooper v. Hill, 94 F. 582, 585 (C.C.A.8).

▇▇▇▇ The controlling principle seems to us to be that while the bank has no power, either express or implied, to enter upon an original speculative enterprise, yet as an incident to its express powers the bank has a right to acquire property, to put it in condition for resale, and where such property is a manufacturing establishment whose value depends substantially upon uninterrupted operation, we think implied power exists to continue such operation for a time providing the primary purpose of the bank is to·save its debt rather than to speculate in future profits, and there is reasonable prospect of realization. How much new money may to that end be invested, and how long such operation may continue, must depend, of course, upon the necessities and peculiar circumstances of each individual transaction. The particular problem envisioned may not be resolved by the application of arbitrary or empirical tests, and much must be left to the business judgment of those responsible for its solution if such judgment is honestly exercised. There is ample if not wholly undisputed evidence that the sal-

vaging of the debt to the bank was the only purpose of the adopted plan, and the master found it so to be. Of course the purchase of outstanding claims required a substantial sum of money, upwards of $300,000, and the purchase of the real estate and plant equipment required in addition to the bonds held by the bank a further outlay. But figures are in such cases merely relative. The bank acquired an inventory, fairly appraised at several times the debt, and a well-equipped plant of 35 acres in the heart of Louisville. The expectation that it could therewith reduce or prevent a loss was a reasonable one. That it would require approximately three years to acquire title to the Wagon Company's real estate and equipment was not, of course, in contemplation, and it is not suggested that the delay was in any manner due to the fault of the appellants. That the acquisition of the property by the bank, and the manner of it, met with no criticism on the part of the bank examiners or the Comptroller is also important, and this without reference to whether reports of the examiners were ever brought to the attention of the directors, and without respect to any power on the part of the Comptroller to tie his hands by practical construction. As late as October 13, 1928, Chief National Bank Examiner Wood reported to the Comptroller that the operation of the plant even at a loss had probably been a wise thing, and still later, on May 25, 1929, his report contains the statement, "One of the benefits resulting from this operation has been the fact that the plant continued as a going concern, with the added value that attaches to a going concern over an idle plant." It requires little citation to demonstrate that there is an element of value in an assembled and established plant even under receivership or in bankruptcy, In re Nathanson Bros. Co., 64 F.(2d) 912 (C.C.A.6), and continued operation by receivers under court orders may well have given apparent sanction to the plan adopted by the bank in the present case.

That it was the purpose of the bank to sell the Wagon Company property as soon as title was acquired is manifested by its preparations for prompt passing of title to purchasers and by its numerous efforts to sell. All the stock certificates of the new corporation were signed in blank by the officers of the company and delivered to the bank. At first efforts were made to sell this stock through one or more stock-selling agencies, and funds were advanced for that purpose. These proving unfruitful, the bank made numerous efforts to sell the physical assets. There was no expectation that the bank would have to supply new money in substantial amount to carry on the business for the purpose of preserving going-concern value. The plant was freed from all fixed charges, and had a large inventory which might be worked up and disposed of for the purpose of reducing the debt to the bank. That this expectation was not ill founded is evidenced by the fact that during the first year of operation, from August 8, 1924, to August 1, 1925, the advance less the amount recovered from one of the stock-selling agencies was but $2,355. We are unable to conclude, therefore, that the original purchase and acquisition of the Wagon Company property was beyond the incidental and implied powers of the corporation and so ultra vires.

It was not until the second year of operation that substantial advances began to be made. These were at first by way of permitting overdrafts, later consolidated into notes. This continued to June 20, 1930, when the bank sold all of the property of the Wagon Company to Caldwell & Co., a brokerage house, for 100,000 shares of stock in the Banco Kentucky Company. During this period more than a million dollars was advanced by the bank, and if we ignore, as did the court below, the Banco Kentucky stock on the assumption that it was then as it afterwards clearly became, an asset of no value, the money so advanced was entirely lost. There can be no doubt that the continued operation of the Wagon Company's business under these circumstances became highly speculative and therefore beyond the power of the bank and ultra vires. Both master and court so held, and the officers of the bank who knew the true situation are liable for the full amount of the loss. A separate issue, however, presents itself in respect to the appellants, and this involves consideration of the terms of the National Banking Act, under which they likewise were held liable. Section 5239 Rev.St., title 12, § 93, U.S.C. (12 U.S.C.A. § 93) provides: "If the directors of any national banking association shall knowingly violate, or knowingly permit any of the officers, agents, or servants of the association to violate any of the provisions of this chapter, all the rights, privileges, and franchises of the association shall be thereby forfeited. * * * And in cases of such violation, every director who participated in or assented to the same shall be held liable in his personal and individual capacity for

all damages which the association, its shareholders, or any other person, shall have sustained in consequence of such violation."

The meaning and scope of this section is clearly settled by the decisions of the Supreme Court. For a director to be held liable it must appear that he "participated in or assented to the excessive loan or loans [or other violations], not through mere negligence, but knowingly and in effect intentionally (Yates v. Jones National Bank, 206 U.S. 158, 180, 27 S.Ct. 638, 51 L.Ed. 1002), with this qualification, that if he deliberately refrained from investigating that which it was his duty to investigate, any resulting violation of the statute must be regarded as 'in effect intentional' (Thomas v. Taylor, 224 U.S. 73, 82 [32 S.Ct. 403, 56 L.Ed. 673]; Jones National Bank v. Yates, 240 U.S. 541, 555, 36 S.Ct. 429, 60 L.Ed. 788)." Corsicana National Bank v. Johnson, 251 U.S. 68, 71, 40 S.Ct. 82, 84, 64 L. Ed. 141. See, also, Payne v. Ostrus, 50 F. (2d) 1039, 1041, 77 A.L.R. 531 (C.C.A.8); Chesbrough v. Woodworth, 195 F. 875 (C. C.A.6); Watts' Appeal, 78 Pa. 370.

The master found that through concealment of facts from the directors by the officers appellants had no actual knowledge of the sums which were being expended in the operation of the Wagon Company during the period in controversy. Exceptions to the finding in this respect were overruled by the court. It is, we think, clear for reasons presently to be indicated, that the court considered the want of actual knowledge immaterial. It would be impossible to review the prodigious record and comment upon each item of evidence or the numerous contentions of counsel made in the exhaustive briefs with reference to this subject. It is sufficient to say that the large overdrafts of the Wagon Company were concealed from the directors by Brown, the president of the bank, with the connivance of the other officers. Brown had repeatedly assured the directors that the Wagon Company was "making its way." Such criticism of the account as was made by the bank examiners was likewise concealed from the directors, though it must be said in passing that there was no suggestion in any of their reports that the operation of the company was ultra vires. The Wagon Company's indebtedness as it appears in the excessive loan schedule on the reverse side of the reports to the Comptroller was inserted after signature by the directors. When in contemplation of the unification of the bank with the Louisville Trust Company a committee of the latter's directors looked into the affairs of the Wagon Works they were told by Brown that the Wagon Company had a worth of $1,500,000 exclusive of inventory, and that the bank's carrying figure was less than $440,000. The directors were expressly exonerated from any misconduct or bad faith by both court and master. There was here no abdication of duties or responsibilities as in Bowerman v. Hamner, supra, and the unusual diligence of substantially all of the directors was noted in the master's report, and made the basis of his findings.

Notwithstanding, however, this lack of actual knowledge or knowing participation in the expenditure of large sums in the operation of the Wagon Works, and notwithstanding also lack of any evidence pointing to any deliberate refraining from investigating in respect thereto, the court found the whole transaction from beginning to end to be ultra vires, and this on the sole ground that "the speculative nature of this plan, the inevitable necessity of future substantial cash outlays therein, and the obvious uncertainty as to the saleability of this business, and as to the operating results thereof pending such sale, were facts which could not have been unknown to the participating and assenting officers and directors of the bank." It was therefore held to be immaterial whether the directors ever actually knew the amounts which were being expended or precisely what losses were being sustained. The essential vice in the transaction was said to be the knowing and intentional participation of the officers and directors in a comprehensive unitary plan pursuant to which the incorporation of the new company and the acquisition and operation of the business was carried out. In this respect it makes no distinction between old or new directors (9 F.Supp. 151), or between officers and nonofficer directors. This was in amplification of the original opinion (7 F.Supp. 924, 936) wherein it was said, "But to organize, as it did, a new corporation, of which it became the beneficial owner, for the purpose of not only taking over the business of its debtor, but also of operating such business for an indefinite period, followed by its actual operation thereof for several years, was beyond the powers of the bank, as the defendants were bound, and must be presumed, to know."

We have given careful scrutiny to the record. We are unable to draw the inferences from the evidence as were drawn below. We find no indication of a unitary

plan to engage in a business of speculative nature, no evidence that substantial future outlays were contemplated or were reasonably inevitable, no obvious uncertainty of saleability, and no purpose of operating the business for an indefinite period. The record is clear that the original purpose of taking over the Wagon Company was to save the bank from loss by the sale of the property as a going concern. That the sale would be delayed by difficulties of acquiring title, and that large sums would be consumed in operation were never contemplated, and that the market would crash in 1929 was, of course, no more expected by the directors than by other business leaders of the period. The sums expended without their knowledge are not without more to be attributed to vice in the original plan. The very commendable effort made by the court below to differentiate the functions of the historian from those of the prophet but emphasizes the difficulty of freeing the mind from the influence of a subsequent diagnosis while retrospectively evaluating prognosis. The finding of an original purpose to operate the business for an indefinite period based in any degree upon its actual operation thereafter for several years illustrates the point. While it has sometimes been held that on questions of value at a given time, after-acquired knowledge is not to be disregarded, for "Experience is then available to correct uncertain prophecy," Sinclair Refining Co. v. Jenkins Petroleum Process Co., 289 U.S. 689, 697, 53 S.Ct. 736, 739, 77 L.Ed. 1449, 88 A.L.R. 496, the rule is not to be applied when retrospectively adjudging a liability based upon current knowledge of wrongful acts and without which they may not be averted. The burden of proof being clearly upon the receiver, we think it has not been sustained, and the decree will be reversed in so far as it imposes liability upon the appellants for violation of the statute in respect to the purchase and operation of the Kentucky Wagon Company.

## Wakefield & Company Loans.

The second transaction for which liability was imposed upon the appellants comprised loans in substantial amount to an investment banking firm in Louisville known as Wakefield & Co., owned and operated by one Mrs. Latta. These, when aggregated with loans made to persons discovered to be officers and employees of that firm, and for its accommodation and account, constituted excessive loans within the prohibition of section 84, Title 12, U.S.C. (12 U.S.C.A. § 84 and note) which provides: "The total obligations to any national banking association of any person, copartnership, association, or corporation shall at no time exceed 10 per centum of the amount of the capital stock of such association actually paid in and unimpaired and 10 per centum of its unimpaired surplus fund. The term 'obligations' * * * shall include in the case of obligations of a copartnership or association the obligations of the several members thereof."

The liability for making excessive loans is governed by section 93, of Title 12, U. S.C. (12 U.S.C.A. § 93) heretofore quoted.

The court approved the findings of the master upon the evidentiary facts bearing upon the Wakefield loans. He rejected the inferences which the master drew. Brown was using Wakefield & Co. as a means of obtaining the proceeds of its borrowings for his personal benefit. He fraudulently caused to be concealed from the nonofficer directors reports of bank examiners, letters from the Comptroller of the Currency, and other information which would have disclosed the Wakefield loans to be in excess of the statutory limit. The directors had no reason to doubt the propriety of such loans, and in approving them relied upon the officers of the bank, to whom they had intrusted the administration of the details of its affairs. It is clear that the court unreservedly accepted the findings of the master that the nonofficer directors were without actual knowledge of the fact that loans were made to employees of Wakefield & Co. and for its account, and that they should be aggregated with direct loans. Except for one circumstance presently to be considered, upon which the court relied in imposing liability, no facts are found upon which to base an inference that the appellants knew or should have known the excessive character of the Wakefield loans. Before giving it consideration, however, a more complete picture of the situation as painted by the master and accepted by the court is required.

We quote, as did the court: "Of course, a bank president who has deliberately made up his mind to use the bank's funds in his personal business and speculation must think out a plan or scheme by which he imagines he can safely do this. * * * Brown clearly determined to use Wakefield & Company in his scheme for making personal use of the bank's money. * * * It is perfectly apparent that Brown and Jones

without protest from any member of the Loan Committee, were designedly omitting to read parts of the reports of the examiners, concealing letters from the Comptroller, fraudulently evading the demands of that office, continuously misleading the non-officer directors. The covering up which Brown and Jones were guilty of, and their acts of concealment in the presence, and with the acquiescence, of the other officers while the board of directors was in session, strongly indicates collusion between these parties, the purpose of which was to enable Brown, without the knowledge of the non-officer directors, to successfully extract funds from the bank in the name of Wakefield & Company or its employees. * * * It is claimed that certain letters addressed by the Comptroller to the directors furnished actual notice to the members of the board of the fact that debts of Latta, Greer, Harris, Schweitzer and Meagher were to be included with the debts of Wakefield & Company, and that there was consequently an excessive loan to that company. I do not think that any of these letters reached the board of directors notwithstanding the recitation in the minutes to that effect. * * * It is satisfactorily established that the minutes after being read to the board, were fraudulently altered so as to show the presentation and consideration of these letters. The concealment of these letters from the Board, and the fact that such questionable, not to say dangerous, means were resorted to to accomplish it, demonstrates the character of the collusion with which the directors were unknowingly surrounded. * * * There was ample motive for withholding the letters from the board of directors. The great weight of proof is that they were withheld, and the alteration of the minute book clearly established is really a potent circumstance to prove that the letters were in fact withheld. The fabrication of evidence to show that they were presented to the board shows that they were withheld. It seems that there was a concerted plan to do this because Brown and Jones did it successfully in the presence of others who knew and at the time allowed it to be done without protest. * * * Going back to the reading of the examiner's reports by Brown to the board, it will be remembered that these reports were made in duplicate, one copy being furnished to the bank and the other to the Comptroller. Difficulty was encountered after the bank closed in finding or getting together the bank's copies. Some of them

were found in Mr. Jones' safe, as were also the letters above referred to. Some of the reports had been taken apart and the sheets removed. The defendants after a time secured certified copies of all reports from the Comptroller's office. Comparing these with the bank's copies of reports, it was found and is established in the record, that the missing sheets in the bank's copies related to loans which had been severely criticized by the examiner."

We come then to the single circumstance which led the court to the conclusion that the appellants were charged with notice of the excessive loans to Wakefield & Co. and its employees. In a report of one of the bank examiners on April 23, 1927, it was pointed out that the loans to three individuals who were employees of Wakefield & Co. were in fact loans to Wakefield, that the proceeds were credited to its account on the books of the bank, and the interest thereon paid by Wakefield. The aggregate was set up against Wakefield & Co. as an excessive loan. On June 30, 1927, the Deputy Comptroller of the Currency sent to the bank a letter addressed to its board of directors, referring to the examiner's report and directing that the total loan should be reduced to the 10 per cent limit. On September 7, 1927, the Deputy Comptroller sent a second letter addressed to the board of directors requesting advice over the signature of available directors as to whether excessive loans had been reduced to the legal limit. That the examiner's report and the several letters from the Deputy Comptroller were concealed from the directors is established by the master's findings accepted and approved by the court. But on or about September 16, 1927, Jones, the cashier of the bank, prepared and presented to each of twelve directors separately at his office or home a letter addressed to the Deputy Comptroller and signed by the defendant Brown as president of the bank. This letter advised the Comptroller that in response to his office letter of September 7 with reference to the last examination of the bank and to previous correspondence in regard thereto, loans to the Kentucky Jockey Club and the Consolidated Realty Company, listed as excessive of the legal limit, had been reduced. When so presented for signature the letter did not have attached to it any list of loans and made no mention of loans to Wakefield & Co., whereupon each of the twelve directors, after reading the letter, without seeing or making any request or effort to see the office letter to which refer-

ence was made, or previous examinations or correspondence, affixed his signature and handed it back to the cashier.

It seemed clear to the court that if any of these directors had asked for and examined the letter of September 7 he would have been directed to earlier correspondence and to the examiner's report and so have become fully informed concerning the nature of the Wakefield indebtedness as an excessive loan; that the circumstances under which the reply was presented were such as to impose upon the directors approached the duty to examine the letter of the Comptroller to which they were replying; that the fact that the letter bore date of the day on which a meeting of the board had been held and had not been there presented, and that no explanation of that fact had been made should have put the directors who signed upon inquiry, which if made would have disclosed the true status of the loan. From these circumstances the court arrived at the conclusion that when each of the directors mentioned neglected to make such inquiry, he deliberately refrained from investigating that which it was his duty to investigate, and the violation was therefore in effect intentional within the construction of the statute in the Corsicana Case, supra. It decreed liability.

We are unable to agree. Of the twelve directors who signed the reply to the Comptroller, four were members of the loan committee and officers of the bank, and so not among the appellants. The remaining eight were nonofficer directors who personally or by representatives have appealed. All of the latter testified except one who had died and another who had become incapacitated for giving evidence. Their testimony is clear, cumulative, and uncontradicted, and their characters gave it credence. When the letter to the Comptroller was brought to each of them individually by Jones, it had already been signed by Brown. It contained a reference to two excessive loans, that to the Kentucky Jockey Club and that to the Consolidated Realty Company. The Jockey Club's account had been excellent. It usually carried large balances in the bank, the excess of the loan was for temporary purposes, was maintained but a few days, and was promptly reduced. The Consolidated Realty Company loan became excessive upon the ruling of the Comptroller that loans to certain individuals were to be aggregated therewith. With this ruling, Jones informed the directors, the officers of the bank did not agree, but had immediately complied with the request to compel its reduction. The directors were not advised and had no knowledge of the fact that the Comptroller's letter had been addressed to them rather than to the bank, and Jones informed each of them that the reply was a mere routine matter, a formality. Examination of the reply indicates that it was carefully framed to satisfy the Comptroller and at the same time to give as little information as possible to the directors who were solicited for signatures. "Wish to advise that loans listed by your Examiner as excessive of the legal limit have been reduced as follows: Loans listed under the caption —Overdue, Slow and Doubtful paper, have been reduced $1,032,707.81 as per detailed list attached." "Loans listed under the caption of loans especially mentioned have been reduced $966,797.64, as per itemized list attached." It must be observed that there is no suggestion anywhere of excessive loans other than the two mentioned, and they had been brought within the legal limit. The total reductions if true showed marked and prompt action to comply with the demands of the Comptroller.

Were the issue here one of negligence, which it is not, the receiver would have, perhaps, a better case, though still a hard one. Brown was the highly regarded president of the bank. Jones was its trusted cashier. The evidence discloses that no man was more highly respected by the citizens of Louisville than was Brown. He had been the successful head of a constituent bank. He was considered to possess a large private fortune, and his membership on boards of directors, including those of railroad companies and great enterprises such as the Standard Oil Company, was eagerly sought. It must be remembered that up to this time there had not been a breath of suspicion upon his integrity and high character, or his loyalty to the bank. Equally true was this of Jones and other officers of the bank. But a few months before, at its unification with the Louisville Trust Company, the Comptroller, upon approving a large stock dividend proposed by the bank, had congratulated the president of the Trust Company on making an affiliation with such an excellent institution. In March the Louisville clearing house examiners, Humphrey Robinson & Co., had found the bank in sound and prosperous condition. It is true that Brown was active in the Louisville Jockey Club, but this was in a community where indulgence in "the sport of kings" is not considered in-

compatible with civic virtue or business honor.

In the conduct of great enterprises, and perhaps of small ones, faith must somewhere be reposed, even by the most captious management, or the entire fabric of our complicated business organization must break down under weight of suspicion and distrust. Notorious examples to the contrary notwithstanding, honesty is still the rule and rascality the exception, and while due diligence in selecting and supervising officers and employees is required of the directors of a bank, clairvoyance is scarcely to be expected. Ours is neither a political nor industrial order for whose continued existence espionage and counter espionage is the price, and wherein every man is suspect.

But the issue as here presented is not one of mere negligence, for it "is clearly also established by previous decisions of this court, pointing out that where by law a responsibility is made to arise from the violation of a statute knowingly, proof of something more than negligence is required, that is that the violation must in effect be intentional." Yates v. Jones National Bank, 206 U.S. 158, 180, 27 S.Ct. 638, 645, 51 L. Ed. 1002, citing McDonald v. Williams, 174 U.S. 397, 19 S.Ct. 743, 43 L.Ed. 1022; Potter v. United States, 155 U.S. 438, 446, 15 S.Ct. 144, 39 L.Ed. 214; Utley v. Hill, 155 Mo. 232, 264, 55 S.W. 1091, 49 L.R.A. 323, 78 Am.St.Rep. 569. Later it was said in Jones National Bank v. Yates, supra, "If this finding, fairly construed, did not import more than mere neglect or inattention, it would not be sufficient to sustain a recovery; for Congress did not make negligence the test of liability." In Chesbrough v. Woodworth, 221 F. 912, 914, it was thought by this court, where negligence was not the issue, that a director was liable only for that conduct which is practically equivalent to intentional misleading. Concededly there may be conduct on the part of the directors of a national bank so grossly negligent or reckless that in effect it is equivalent to a knowing and active participation in statutory violation. It is a far cry, however, from deliberate avoidance of knowledge of the affairs of a bank and complete abdication of duty to supervise and control condemned in Bowerman v. Hamner, supra, to acceptance by the present directors of the signature of the bank's president and the representations of its cashier in the circumstances here considered. Even in the Bowerman Case the court thought the defense there made might perhaps have been applicable if the bill were limited to a charge of liability under the statute.

Where imposition of liability requires something clearly more than negligence, circumstances which fail to meet the less exacting test will fail to meet one more rigid. Bates v. Dresser, 251 U.S. 524, 40 S.Ct. 247, 64 L.Ed. 388, where negligence was the issue, furnishes striking parallels to the circumstances here involved. A bank teller had become a defaulter. A question of the liability of the directors was involved. It was contended that if they had opened the envelopes from the clearing house, and had seen the checks, or had examined the deposit ledger with any care, they would have found out what was going on. They accepted, however, the cashier's statement of liabilities and failed to inspect the depositors' ledger. The statement of assets had always been correct. The fraud was a novelty in the way of swindling a bank so far as the knowledge of any experience had reached Cambridge before that time. The court refused to reverse the finding of the master and the Circuit Court of Appeals (Dresser v. Bates, 250 F. 525) that the directors should not be held answerable for taking the cashier's statement of liabilities to be as correct as the statement of assets always was. Their confidence seemed warranted by the semiannual examination by the government examiner, and they were encouraged in their belief that all was well by the president, whose responsibility as executive officer, interest as large stockholder and depositor, and knowledge from long daily presence in the bank, were greater than theirs. They could hardly have seen that their failure to look at the ledger opened a way to fraud, citing Briggs v. Spaulding, 141 U.S. 132, 11 S.Ct. 924, 35 L.Ed. 662. Of course the court recognized the difficulty of laying down general principles, and confined its decision to the circumstances of the particular case. So must we, but, giving them all due consideration, having in mind the confidence that seemed justifiably to have been reposed by the directors in their officers, the apparently fine condition of the bank, the lack of any reasonable ground for suspicion that all was not well, we are unable to say that the directors should have doubted the cashier's representations and should have insisted upon inspecting the original correspondence between the bank and the Comptroller. Failing in this, there is no basis for a conclusion that they deliberately refrained from investigating that which it was their duty to in-

vestigate. The decree will be reversed in so far as it imposes liability upon any of the appellants for the losses suffered by the bank in consequence of the loans made to Wakefield & Co. or its officers and employees for its account.

### Murray Rubber Company Loans.

When the bank closed, there was due from this company on promissory notes, the sum of $421,249.87. Each of the loans evidenced by such notes was made at a time when the bank held in its investment account $330,000 in principal amount of a series of twenty-year first mortgage bonds of the company acquired in 1922, and being part of a total issue of $750,000 in principal of such bonds. The question here presented, which is solely one of law, is whether these bonds should be included in determining the status of the Murray loans as excessive under title 12, § 84, U.S.C. (12 U.S.C.A. § 84 and note). The District Court held that they must be included, and imposed liability upon all directors consenting to subsequent loans in excess of statutory limitation for all losses suffered by the bank in consequence thereof. With this conclusion we are likewise unable to agree.

The circumstances under which the Murray bonds were acquired are, we think, of no moment. Whether they were bought in the open market with the funds of the bank allocated to investment, or whether they were acquired in payment of a debt, is immaterial. The question is as to whether at their acquisition they were legally permissible investment securities which the bank was permitted to acquire and hold, and whether they remained so, without respect to the limitation upon loans to 10 per cent. of the capital and surplus of the bank, provided by section 84. Prior to 1927 the Banking Act contained no separate provision limiting the investment of its funds in what were regarded as investment securities to any specific percentage which the obligations of any single individual or corporation bore to its capital and undivided surplus, unless the 10 per cent. limitation of section 84 applied to investment securities as well as to loans. In the only adjudicated federal case to which attention of the court has been called, Bailey v. Babcock, 241 F. 501, 515 (D.C.Pa.), decided in 1915, it was held that the bonds of a company are not to be reckoned as a part of the indebtedness prohibited in the way of making an overloan. It is quite true that one who purchases the bonds of a corporation in a sense loans his money to the company issuing the bonds, even though they be secured by first mortgage lien. City of Allegan v. Consumers' Power Co., 71 F.(2d) 477, 482 (C.C.A.6). It is, however, of course, competent for the Congress to distinguish between loans generally and those that result from the purchase of secured obligations commonly referred to as investment securities, or to recognize a distinction established by practice or construction.

Section 5136, R.S., title 12, § 24, U.S.C. (12 U.S.C.A. § 24) authorizes National banks to exercise such incidental powers as are necessary to carry on their business. Such incidental powers, of course, include the investment of the bank's funds. This section was amended by the act of February 25, 1927 (44 Stat. 1226) which inter alia provided: "That the business of buying and selling investment securities shall hereafter be limited to buying and selling without recourse marketable obligations evidencing indebtedness of any person, copartnership, association, or corporation, in the form of bonds, notes and/or debentures, commonly known as investment securities, under such further definition of the term 'investment securities' as may by regulation be prescribed by the Comptroller of the Currency, and the total amount of such investment securities of any one obligor or maker held by such association shall at no time exceed 25 per centum of the amount of the capital stock of such association actually paid in and unimpaired and 25 per centum of its unimpaired surplus fund."

In pursuance of the authority granted by the amendment, the Comptroller in June of 1927 promulgated a regulation further defining the term "investment securities." Whether the bonds of the Murray Company responded to the definition of the statute, or the amplified definition of investment securities promulgated by the Comptroller, is, we think, immaterial. Our concern is with the implications of the 1927 amendment, the Murray bonds having been acquired prior to its passage. The language of the amendment is: "That the business of buying and selling investment securities shall hereafter be limited." Then follow limitations (1) as to the character of obligation, to be further defined by the Comptroller, and (2) as to amount evidencing the indebtedness of any person, copartnership, or corporation. Here, we think, is inescapable recognition of a clear line of de-

marcation between investment securities and loans. The latter were prescribed beyond the 10 per cent. limit. Since there was no limitation upon the former, except, perhaps, such as may have been dictated by sound banking practice and the generic designation "investment securities," the amendment expressly established limitations both as to kind and as to amount, undoubtedly to curtail a practice subject to abuse. But these limitations were expressly made prospective, and not retroactive. All this is made clear by what followed. The 25 per cent. limitation upon investment securities was found insufficient, and so by the Act of June 16, 1933, section 24, 12 U.S.C.A. as amended by the Act of 1927 was again amended, this time to provide that "in no event shall the total amount of the investment securities of any one obligor or maker held by the association for its own account exceed at any time 10 per centum of its capital stock actually paid in and unimpaired and 10 per centum of its unimpaired surplus funds, except that this limitation shall not require any association to dispose of any securities lawfully held by it on August 23, 1935." There was no amendment at this time to section 84 (the 10 per cent. limitation on loans). Thus is the distinction clearly recognized by the Congress between loans and investment securities, for if the latter were from the beginning ruled by the 10 per cent. limitation on loans, there would have been no need of the 10 per cent. limitation in the Act of 1933—repeal of the 1927 amendment in so far as it created a 25 per cent limitation is all that would have been required—and so under familiar rules of construction which compel meaning to be ascribed to every word and sentence, the conclusion is not to be avoided that throughout the history of this section loans and what are described as "obligations * * * in the form of bonds, notes and/or debentures commonly known as investment securities" are not in the contemplation of the statute one and the same thing.

We are fortified in this conclusion by the fact that throughout the history of the Murray Rubber Company indebtedness to the bank, the Murray line was listed by the examiner with the knowledge of the Comptroller as included in "Large Lines (not Technically Excessive Loans)." Such listing was made not only before, but after the passage of the 1927 amendment. That these listings were neither casual nor inadvertent, but were in pursuance of a long-held view as to the law on the part of the Comptroller, is apparent in what was said by the court in Bailey v. Babcock, supra, "With reference to the alleged overloan, the letter of the Comptroller of the Currency shows clearly that there has been no prohibition by that department against treating investments in bonds of a company as distinct from the loans to that company upon negotiable paper. It also appears that the examiner of the bank knew of these bonds and did not hesitate to pass them, as he was of the opinion and apparently still is, that the bonds of the company are not to be reckoned as a part of the indebtedness prohibited in the way of making an overloan." To the same effect was the testimony of Chief Examiner Wood in the present case: "We did not regard it at that time as definitely an excess line." It being our conclusion that the 10 per cent. limitation upon loans did not apply to investment securities at the time the loans here considered were made, and that the limitations of the 1927 amendment were not retroactive as to them, it follows without regard to certain nice distinctions that are urged upon us between the terms "liability" and "obligation," that the decree must be reversed in so far as it imposes any liability upon the appellants for losses suffered by the bank in consequence of loans to the Murray Rubber Company.

#### Norman & Company Loans.

Norman & Co.'s borrowing limit was reached July 11, 1930. Theirs was an active line. Where the notes were discounted, the practice was to include the interest in the principal of the notes. On demand notes, where interest could not be so computed, it was later paid. Subsequent to July 11, 1930, further advances were made upon direct obligations of Norman & Co. in the sum of $103,700. The master held and the appellants contend that the taking of notes which included interest by the addition of which the total obligations of the maker were caused to exceed the statutory maximum, did not constitute the loans as excessive. It may be true that loans which are not excessive when made do not become so by the mere running of time, and that inclusion of interest with principal is of itself ineffective to constitute the loan excessive, for under such circumstances "no new money leaves the bank's vaults." Payne v. Ostrus, 50 F. (2d) 1039, 1041, 77 A.L.R. 531 (C.C.A.8). However, when by the addition of interest, incorporated in original and again in renewal notes, the total indebtedness of a bor-

rower increases so that when an entirely new loan is made the aggregate is in excess of that which the bank is permitted by law to loan to the borrower, it cannot, we think, with reason be said that the additional loans are not prohibited by the statute, for then new money does leave the bank's vaults, and it is immaterial, once the past-due indebtedness aggregated with the new loans is shown to be excessive, whether there is a failure of proof as to how much of the old indebtedness represents principal and how much represents interest. Payne v. Ostrus, supra, is not to the contrary.

We agree with the court that the amount adjudged to be due from the directors by reason of losses in consequence of the Norman loans should be recovered. We are not justified in rejecting the court's finding that the appellants adjudged liable were familiar with the facts and circumstances under which the loans were made. As we have indicated, the line was at all times an active one, and the directors were quite conversant with the Norman needs and the circumstances from which they sprung. Director Jones (not the cashier) heard the line of indebtedness read at $580,000 before additional loans were made. In May of 1930 Director Mengel fully appreciated the problem presented by the Norman loan. Moreover, the executive officers of the bank had no interest in Norman & Co., and no reason to deliberately conceal vital information with respect to its account from the directors. The decree in so far as it awards damages for losses suffered in consequence of the Norman loans will be affirmed.

### Loans on Shares of the Banco Kentucky Company

In 1927, when, as indicated, the National Bank of Kentucky merged with the Louisville Trust Company, the plan of unification required the transfer of the stock of each institution to trustees, who in exchange issued trust participation certificates. Some phases of this plan as executed have already been before the court in National Bank of Kentucky v. Louisville Trust Company (C. C.A.) 67 F.(2d) 97, and Laurent v. Anderson, supra. In 1929 a suggestion was made for the formation of the Banco Kentucky Company, to be organized for the purpose of taking over ownership and control of banks and trust companies, in the Ohio Valley. Whatever may now be thought of it, there is little doubt that the era was considered by many to be one of expanding enterprise, and need was seen for financial institutions capable of serving greatly enlarged business requirements. The banking interests of Louisville were not alone in entertaining this concept. See Barbour v. Thomas, Receiver (C.C.A.) 86 F. (2d) 510, this day decided. Consequently the plan for the incorporation of Banco met with a ready response on the part of the directors of the National Bank of Kentucky.

On July 16, 1929, Banco was incorporated under the laws of Delaware, and authorized to issue 2,000,000 shares of the par value of $10 each. The broadest powers available under the laws of Delaware were obtained, and on July 19th the officers and directors of the bank and those of the Louisville Trust Company, addressed to holders of trust participation certificates a letter setting forth the plan of organization. Banco stock was to be sold at not less than $25 per share, but two shares of Banco were to be exchanged for each trust participation certificate. Since these certificates represented bank and trust company stock having a book value of $16.46, the proposal was an attractive one, resulting in the great majority of participation certificate holders making the exchange. There followed also an active campaign by officers and employees of both the bank and the trust company to promote the sale of Banco shares, as a result of which 394,786 shares of Banco were sold, and $9,869,650 paid into the treasury of the new corporation. Its stock was listed upon the Chicago Exchange, and reached $32 per share, though inference is warranted that market quotations were considerably influenced by transactions manipulated by Brown through Wakefield & Co.

From September 26, 1929, to the date of the bank's suspension, numerous loans were made by the bank, approved by its directors, to finance the purchase of Banco shares. In all, approximately $4,000,000 was loaned by the bank on notes secured wholly or in part by shares of Banco, most of the loans being approved after October 1, 1929.

Prior to September 11, 1929, negotiations had been begun by the Banco Kentucky Company for the purchase of two Cincinnati banks, the Pearl Market Bank & Trust Company and the Brighton Bank & Trust Company, and on September 25, 1929, a contract for the purchase of a controlling interest in each was concluded—though they were actually taken over some time later. The consideration included shares of Banco, which on the basis of $25 per share rep-

resented a total of $2,159,875. When most of the assailed loans were made on Banco stock the situation was substantially as follows: Banco owned 470,000 of a total of 575,000 trust participation certificates representing ownership of stock in the bank and in the Louisville Trust Company, it had subscriptions to its own stock in the amount of $10,000,000, on which $5,784,875 had been paid by October 1, 1929, and $9,222,451.21, by October 10, 1929, and it had concluded the purchase of a controlling interest in the two Cincinnati banks. The master accordingly found that "It was thus clearly not contemplated in the beginning, or intended at any time, that the Banco Kentucky Company should be organized merely as a holding company for the stock of the National Bank of Kentucky," a finding not rejected by the District Judge.

The failure of the Banco Kentucky Company followed by but a few days the closing of the bank. Whether the second catastrophe was a consequence of the first, or both the inevitable result of the financial debacle of the period invites interesting but for our purpose idle speculation. What is important is that many of the loans made on Banco stock became uncollectible and the security in so far as it consisted of such stock worthless. The legal basis for the liability asserted against the appellants for resulting loss is section 5201 R.S., being section 83, title 12, U.S.C. (12 U.S.C.A. § 83). It provides that "No association shall make any loan or discount on the security of the shares of its own capital stock, nor be the purchaser or holder of any such shares, unless such security or purchase shall be necessary to prevent loss upon a debt previously contracted in good faith." While section 83 provides no penalty, section 93, already recited in another connection, is applicable to all violations of the statute. It imposes a civil liability on all directors who knowingly violate or knowingly permit a violation of any of its provisions.

█ It has been said that, "Where a statute creates a duty and prescribes a penalty for non-performance, the rule prescribed in the statute is the exclusive test of liability." Yates v. Jones National Bank, supra, 206 U. S. 158, 179, 27 S.Ct. 638, 51 L.Ed. 1002. Whether these sections of the statute are therefore penal, requiring strict construction, as has sometimes been indicated (Chase v. Curtis, 113 U.S. 452, 5 S.Ct. 554, 28 L.Ed. 1038; Nat. Park Bank v. Remsen, 158 U.S. 337, 15 S.Ct. 891, 39 L.Ed. 1008), or whether,

since they give a civil remedy at the private suit of the receiver for the benefit of stockholders and depositors, with damages measured by the losses consequentially suffered, they are in this respect remedial (Huntington v. Attrill, 146 U.S. 657, 13 S.Ct. 224, 36 L.Ed. 1123; cf. Brady v. Daly, 175 U.S. 148, 155, 20 S.Ct. 62, 44 L.Ed. 109), we need not determine. In either view a statute that is clear and unambiguous requires, under familiar rules, no straining of its terms, either to include within its condemnation offenses or persons other than those which are clearly described and provided for, or to exclude from its operation offenses which the words, in their ordinary acceptation, would comprehend.

█ The decree awarded damages for all losses suffered by the bank in consequence of loans made on Banco stock, not only on the court's assumption that the relation of the two corporations was such that equity must ignore the separate corporate existence of Banco and treat its stock as in substance and effect the stock of the bank, but also on the ground that the very words of the statute require an adjudication of liability. The latter conclusion was based on the use in the statute of the phrase "on the security of the shares of its own capital stock." If we follow the argument in this respect, it means that all loans are invalid whose security is supported to any extent by the value of the stock of the lending bank, whether deposited as collateral or not, for the point is made that loans are forbidden not merely on certificates representing shares of the bank's capital, nor yet on the shares themselves, but on the security of its shares. Statutory construction, however, even where required, must by all accepted canons of interpretation be reasonable, and even were we to assume ambiguity, a reading of the words of the act must be rejected which leads upon analysis to unreasonable if not indeed to absurd results, and establishes such standard of duty for bank directors that either compliance becomes wholly impossible or risk of violation so great that honest men will not assume it.

If invalidity attaches to every loan for the repayment of which recourse may ultimately be required to assets of the debtor which include stock of the lending bank, and that is in essence the meaning sought to be given to the phrase "on the security of the shares of its own capital stock" then all loans are suspect, regardless of the finan-

cial standing of the debtor or the intrinsic worth of his collateral. The directors must at their peril ascertain whether securities offered as collateral, including not only stocks, but bonds and mortgages, are those of a corporation owning stock of the bank or of a corporation which holding no bank stock itself, owns shares in other corporations which do. The bank may not loan to its own stockholders, individual or corporate, with or without security, for ultimately it may have to acquire its own stock either by foreclosure of collateral or upon execution levy. That no such meaning may, however, be ascribed to the phrase in question is indicated by the very language which follows it, to wit, "unless such security or purchase shall be necessary to prevent loss upon a debt previously contracted in good faith."

It is common knowledge that when in 1933 the banks were closed by executive order, some never to reopen, a number of large industrial corporations relieved the financial paralysis induced thereby in localities within their sphere of influence by establishing new banks, with the aid and encouragement of the banking authorities. Had it been thought at that time that the stock of such corporations, by reason of their ownership of bank stock, would be made unavailable as collateral with the banking facility thus provided, especially at a time of greatest necessity for stockholders, there is reason to doubt that this aid to stricken communities would have been forthcoming, for the interpretation now urged if then accepted would have inevitably prevented the exercise of private corporate initiative in the public interest, and have accentuated consequences already grievous. We are unable for another reason also to conclude that section 83 (12 U.S.C.A.) in terms forbids loans on corporate securities other than the shares of the bank's own capital stock whatever may be the holding of such stock by the corporation issuing such securities. Section 5137 of the Banking Act, title 12, § 29, U.S.C. (12 U.S.C.A. § 29) until amended in June, 1933, prohibited loans on the security of real estate. Union National Bank v. Matthews, 98 U.S. 621, 25 L.Ed. 188. It had not been thought, however, that this·prohibition extended to the stock of corporations owning real estate. Baldwin v. Canfield, 26 Minn. 43, 1 N.W. 261, 276; Western Improvement Co. v. Des Moines National Bank, 103 Iowa, 455, 72 N.W. 657; cf. Union National Bank v. Matthews, supra; National Bank of Gene-

see v. Whitney, 103 U.S. 103, 109, 26 L.Ed. 561; Fortier v. New Orleans Bank, 112 U.S. 439, 5 S.Ct. 234, 28 L.Ed. 764; Gamble v. Brown, 29 F.(2d) 366 (C.C.A.4), cert. denied 279 U.S. 366, 49 S.Ct. 253, 73 L.Ed. 986. Nor can any distinction be made between the shares of corporations holding a little stock in the bank and those holding much for as the court below well said: "This statute does not deal with degrees. * * * the prohibition [if it exists] is absolute."

We come then to the question whether the relation between the bank and the Banco Kentucky Company was such that a court of equity would be warranted in disregarding the existence of Banco as a separate corporate entity. It is true that Banco was conceived in the vaulting imagination of the president of the bank; that it was promoted and fostered by the appellants; that the directorates of the two corporations, though not identical, overlapped; that the great majority of trust participation certificates representing stock in the bank became the property of Banco, and that there is a suggestion of identity in the name adopted for the new company. But Banco was not a mere holding company for the bank's stock. It was organized for clearly defined purposes, too optimistically conceived, perhaps, but neither illegitimate nor unlawful. It had its own capital with cash resources at one period almost twice the entire capital and surplus of the bank. While in the very beginning the bank stock may, as found by the court, have been its principal asset, and may have continued thereafter to be its most valuable single asset, it had other assets of very substantial value, and it was warrantable inference at the time of its organization and for a substantial period thereafter that it could well meet any assessment that might be levied upon it as a stockholder of the bank. At any rate there is nothing in the record to point to its creation for the purpose of escaping such assessment. Indeed when the assessment was finally made by the Comptroller it was enforced against Banco and not against the stockholders. See Laurent v. Anderson, supra. Its separate corporate existence was recognized by the very receiver on whose behalf we are now asked to ignore it.

The circumstances under which one corporation will be held to be but the alter ego of another were recently fully considered by us in Shepherd, Trustee, v. Banking & Trust Co. (C.C.A.) 79 F.(2d) 767, 769. We there

approved the doctrine of Pittsburgh & Buffalo Co. v. Duncan, 232 F. 584, 587 (C.C.A. 6), to the effect that "the mere fact that the stockholders in two or more corporations are the same, or that one corporation exercises a control over the other through ownership of its stock, or through identity of its stockholders, does not make either the agent of the other, nor does it merge them into one * * * where each corporation is separately organized under a distinct charter" and likewise gave approval to the exceptions to this general rule announced in New York Trust Co., v. Carpenter, 250 F. 668, 672 (C.C.A.6), and approved in Hooper-Mankin Co. v. Matthew Addy Co., 4 F.(2d) 187, 189 (C.C.A.6), where it was said: "From an examination of many decisions, we venture to say that no corporation acting within its powers has been held liable for the debts of another corporation legally organized, because it controls such corporation by reason of ownership of its stock, or otherwise, except by reason of contract or on grounds of agency, or of estoppel, or because the controlled corporation has been used in such a way that the maintenance of its character as a separate and distinct entity would work injustice." The principle has been affirmatively stated in the Ninth Circuit (Martin v. Development Co. of America [C.C.A.] 240 F. 42, 45) thus: "A holding corporation has a separate corporate existence, and is to be treated as a separate entity, unless facts are averred which show that such separate corporate existence is a mere sham, or has been used as an instrument for concealing the truth, or where the organization and control are shown to be such as that it is but an instrumentality or adjunct of another corporation."

The Banco Kentucky Company was certainly not a sham, for nearly $10,000,000 of actual cash paid for its stock attest its reality, and there is nothing in the record to point to it as an instrumentality of the bank. Nor was it organized for a fraudulent purpose or to conceal secret or sinister enterprises conducted for the benefit of the bank. The master absolved the appellants of all suspicion of bad faith and the court approved his finding in the last of three carefully reasoned opinions ([D.C.] 11 F.Supp. 9, 14). Certainly we must accept this as the deliberate judgment of the court rather than as a euphemism, easing the blow to the sensibilities as it fell heavily upon the purse.

We do not, of course, mean that there are no circumstances under which loans on corporate stock may constitute bad banking, or subject bank directors to charges of negligence, and an undue concentration of the stock of a bank in the holdings of a single corporation out of safe relation to its other assets may make such corporation's own stock undesirable as collateral for loans—but we are passing only upon whether there has been violation of the express terms of the statute in the present case. We find none, and no other issue is here involved. The decree must be reversed in so far as it awards damages against any of the appellants for losses suffered by the bank in consequence of loans on shares of the Banco Kentucky Company.

It follows from what we have just said, and from our earlier discussion, that no consideration need be given to the separate contentions made on behalf of Crawford and the Humphrey estate, nor to the effect of Hieatt's adjudication in bankruptcy upon the award against him. The decree is affirmed as to damages found due from any of the appellants on the Norman & Co. loans, and reversed as to all other awards. The cause is remanded for further proceedings not inconsistent herewith. Decision as to costs of appeal must of necessity be arbitrary. They will be borne 20 per cent. by the appellants remaining subject to the decree, and 80 per cent. by the appellee.