William C. Hecht, Jr., J.
This complaint hy the assignee for the benefit of creditors of Film Classics, Inc., (hereinafter called “ Film”), is brought against Eagle Lion Classics, Inc., (hereinafter called “Classics”) and several interpleaded defendants. Both Film and Classics were engaged in the dis *688 tribution of motion-picture films for various producers, pursuant to a standard form of distribution contract. The complaint alleges six causes of action:
1. Classics collected $122,917.34 for the use and benefit of Film. It has been stipulated that $98,609.57 of this amount was paid over by Classics to the producers to whom Film was obligated to pay it, and Classics retains the balance of $24,307.77.
2. Classics received $4,382.45 from the sale of furniture and other personal property belonging to Film.
3. Classics deposited in its own bank account two checks drawn to Film’s order, aggregating $3,526.94.
3 and 4. Classics collected for the use and benefit of Film, rentals due on motion-picture films on which Film had distribution rights, and which were distributed for Film by Classics. The third cause of action covers the period between June 9 and August 10, 1950, the amount claimed for that period being in excess of $400,000. The fourth cause of action covers the period since August 10,1950, the amount claimed for that period being in excess of $500,000. It was stipulated that Film’s only claim here is to the amount of the distributor’s share of the rental, generally 35%. The balance has been paid over to the producers as required by the distribution contracts.
5. About June 12, 1950 it was agreed between Film and Classics that the former would transfer to the latter all of its going business and physical assets, and that defendant (a newly formed corporation) would commence doing business with the combined personnel of Film and Eagle Lion Films, Inc. (hereinafter called “ Eagle ”). Film turned over all of its assets and going business to Classics and the latter received the same pursuant to the foregoing agreement. Said assets and going business and future distribution rights of Film were reasonably worth $1,000,000.
6. To induce Film to discontinue its business and turn over its assets and future distribution rights, Classics falsely represented to Film that it'would pay reasonable compensation for the foregoing. Film relied upon such representation in turning over all its assets, etc., to Classics. As a result of said fraud, Film suffered damage of $1,000,000.
A motion was made at the trial to amend the sixth cause of action and to conform the pleadings to the proof. The amendment sought to add causes of action in the right of creditors of Film to recover transfers of assets on the grounds (a) that Film’s president was faithless to his duty in transferring its distribution contracts and others assets and (b) that Film was insolvent when the transfers were made. The motion was denied *689 for reasons fully stated in the record and that ruling is adhered to.
The transactions between the parties started with a five-party written agreement dated May 18, 1950, the parties being Film, Eagle, Pathe (Eagle’s parent) and two individuals named Baird and Zwillinger. Both Film and Eagle had been experiencing financial difficulties, which seriously impaired their ability properly to serve their respective distribution contracts. Since the film producers had the right to cancel these contracts in the event that the distributor became insolvent or assigned for the benefit of creditors, both distributors were seeking a method of cutting down their expenses by merger, and also of obtaining required new financing.
The agreement provided for the formation of a new corporation, defendant Classics. Baird and Zwillinger were to receive certificates of indebtedness aggregating $1,250,000 and 25% of the stock in return for their cash contributions of $1,000,000. Pathe and Eagle were to receive $500,000 of certificates of indebtedness and 50% of the stock in exchange for their distribution contracts and all of their physical assets. Film was to receive $250,000 of certificates of indebtedness and 25% of the stock in exchange for its distribution contracts and all of its physical assets.
The new company was to come into existence on June 5. Prior to that date, Film was required to furnish proof satisfactory to Classics and to Baird that its obligations to its producers up to that date had been paid in full. Pathe and Eagle were required to do the same. Film expected to obtain a bank loan to pay off its smaller creditors and to effect a compromise with its larger creditors.
The closing originally scheduled for June 5 was adjourned to June 12. At that time Film informed Eagle and Classics that it had been unable to take care of all of its creditors. On June 13 Baird and Zwillinger notified the other parties that they regarded the agreement “ is of no further force and effect and terminated as to them by reason of your failure to perform and comply with the terms and conditions thereof.” Nevertheless, on June 10, Classics took over all of Film’s distribution contracts, as well as some of its personnel and physical assets and serviced the contracts on Film’s behalf until August 4,1950. This was done pursuant to an alleged oral agreement which will be more fully discussed below. On June 11, Film closed all of its offices throughout the country (except one in Philadelphia, which was taken over by Classics) and discharged its personnel.
*690 Film assigned to plaintiff for the benefit of creditors on June 29, 1950. As a result of such assignment, all of the producers cancelled their distribution contracts with Film. After the assignment, defendant proposed to plaintiff assignee that it would continue the distribution under Film’s contracts pursuant to the alleged oral agreement of June 10. Plaintiff refused to accept this proposal, and on August 4, Classics advised him that it was discontinuing the distribution of all pictures as to which Film had distribution rights.
The distribution contracts generally provided that Film’s compensation would be 35% of the total receipts. Classics contends that it took over the servicing of these contracts on June 10 pursuant to an oral agreement between its president and Film’s president, to the effect that Classics would receive as its compensation for such servicing the same fee as Film was entitled to receive, that is 35%. It is claimed further that the same compensation was to be paid for the collection of $122,000 in accounts receivable.
I find as a fact that Classics has not established a valid contract to that effect. Such a contract may not be proved by the uncorroborated recollection of Classics’ president six years after the event, especially when Film’s president, the other party to the alleged agreement, is now deceased. There are the two additional factors: (a) this alleged agreement, in effect disposing of all of Film’s assets while it was apparently insolvent, was not approved by its board of directors; (b) Film’s president did not have undivided loyalty to it, since on June 5, shortly before this agreement is claimed to have been made, he was elected chairman of the board of directors of Classics.
I hold, therefore, that Classics must be treated as having converted these assets of Film when Classics took them over on June 10,1950. The question remains as to the proper measure of damages for such conversion.
Plaintiff argues that Classics should be required to issue to him the $250,000 of certificates of indebtedness and the 25% of its stock which Film would have received under the agreement of May 18 if it had been carried out according to its terms by all of the parties thereto. Plaintiff’s argument is that Classics by taking over Film’s distribution contracts “ waived ” the performance of the conditions precedent required to be performed by Film, Baird and Zwillinger.
This contention is untenable; whatever wrong Classics may have committed by taldng over these contracts, it cannot be held to a contractual performance conditioned on a cash contribution of $1,000,000 by Baird and Zwillinger, and on Film’s clearing up its obligations, neither of which conditions was performed.
*691 Plaintiff then argues that Classics should be charged with the value of Film’s assets as a “ going business ”, citing cases which hold that such value must be considered in bankruptcies or insolvency eases (Matter of Nathanson Bros. Co., 64 F. 2d 912, 913; Atherton v. Anderson, 86 F. 2d 518, 526; Randall v. Bailey, 23 N. Y. S. 2d 173, 178, affd. 262 App. Div. 844, affd. 288 N. Y. 280). The principle may be conceded, but it has no application to the case at bar.
There is not an iota of evidence to show that on June 10, 1950, Film had the slightest value as a going concern. On the contrary, it was on its last legs as a going enterprise. Its difficulty was not merely an inability to meet its obligations, but apparently an inability even to meet its payroll and its rent, because it immediately closed all of its offices (except Philadelphia) upon turning over its distribution contracts to Classics.
The Nathanson case (supra) involved a retail store with an established clientele and salable merchandise which presumably could be disposed of at going value if the financial stringency were removed. The Atherton case (supra) involved a manufacturing enterprise which had in addition a plant that had a going value if the business could be kept operating. Randall v. Bailey (supra) involved the Bush Terminal, having pier, rail and warehouse facilities that had a going value if the business continued.
All that Film had were distribution contracts which could be promptly cancelled in the event of insolvency or assignment for the benefit of creditors, and which were in fact cancelled when the assignment herein was made. The situation is analogous to that of an automobile dealer who has turned over all of his cars to another dealer, and whose only remaining asset is a franchise from Ford or General Motors or Chrysler, which was promptly cancelled by the manufacturer when the dealer got into financial difficulties. A business in that situation has no going concern value.
There was no evidence, opinion or otherwise, that Film’s distribution contracts could have been sold at any price to any distributor other than Classics. On the other hand, there is evidence that Classics by taking over the servicing of these contracts protected Film against substantial claims by the producers for breach of contract.
Therefore, the value of these distribution contracts at the time of their conversion was only the amounts which Film could have collected as its distributor’s fees thereunder up to the date of their respective cancellations, less the actual cost of performing the services necessary to earn those fees (cf. Griggs *692 v. Day, 136 N. Y. 152,161). On this item Classics has the burden of accounting. It must itemize the distributor’s fee collected on each contract and must prove its actual cost of servicing each contract. This cost may in no event exceed what Film’s own cost would have been. The cost computation should give full effect to any economies in operation which Classics was able to achieve by reason of combining the distribution of Film’s pictures with its own without a proportionate increase in personnel and office facilities.
The accounts receivable of $24,309.27, the proceeds of the two checks claimed in the third cause of action, should likewise be paid over to Film subject to deduction only in actual costs attributable to the collection of these items. Film’s producer’s share of $7,698.98 should also be paid over to it. As to the furniture, motion-picture reels and cases and other tangible personal property, plaintiff will have to establish their fair market value on June 10, the date of the conversion; plaintiff cannot recover their original cost.
The situation changed on August 10. At that time plaintiff assignee had definitely refused to accept the return by Classics of all the assets which had been converted by it. His excuse was that ‘1 by reason of the abandonment or discontinuance of the exchanges by Film, I could have no distribution facilities and could do nothing to assure continuity of distribution.” But I find as a fact that this discontinuance of its facilities by Film, and the consequent inability of Film and of its assignee to continue to service its distribution contracts, was not due to any act of Classics but rather to Film’s own financial straits, which precluded its continuing in business.
I conclude that if plaintiff receives the amounts collected under the distribution contracts until their cancellation and the accounts receivable, less the cost of collecting the same, as of June 10 (the date of conversion), plus the actual value of its physical assets, it will be made whole for the wrong done to Film by the conversion (Flagler v. Hearst, 91 App. Div. 12 [1st Dept.]; Murphy v. Hofman Co., 177 App. Div. 380, 381 [3d Dept.]).
The fourth and fifth causes of action are dismissed as legally insufficient on the facts proved by plaintiff. The sixth cause of action is dismissed because there is no proof of the alleged fraudulent representations. Plaintiff is entitled to some relief in respect of the first three causes of action. Although the third cause of action is pleaded for money had and received, it will support a recovery for the conversion found herein.
*693 If the parties agree on a form of judgment embodying those legal principles, it may be submitted. Otherwise a referee will be appointed to take and state the account.
There remains for disposition the claim of the interpleaded defendants. These defendants had distribution contracts with Film which were serviced by Classics from June 10 until some date subsequent to July 1 when they made distribution contracts directly with Classics. The producers claim the entire net rentals for the pictures without any compensation to Classics, on the ground that the latter handled the distribution without any authority from the producers.
Here again we have a conversion by Classics of the producers’ films, which was not cured by the subsequent distribution agreement inasmuch as it was not retroactive. However, Classics should be entitled to deduct its actual cost of distribution or the cost which the producers would have incurred in using another distributor, whichever is lower. The burden of establishing this actual cost is on Classics. If the parties can agree on the amount of such deduction, it may be incorporated in the judgment; otherwise this item will also be referred to a referee to take and state the account.
During the course of the trial certain testimony was received! over the objections of the attorney for defendants, subject to being connected. This requirement having been met, the testimony has been considered by the court and the objections to its reception are overruled.
Settle judgment. . i ^ ^